Sheila Ryan DeLUCA, Petitioner–
Appellee,

v.

Elaine A. LORD, Superintendent of Bedford Hills, Correctional Facility; and Robert Abrams, Attorney General of the State of New York, Respondents–Appellants.

No. 1705, Docket 94–2418.

United States Court of Appeals,
Second Circuit.

Argued March 20, 1995.

Decided Feb. 13, 1996.

Jonathan Svetkey, Assistant District Attorney, New York City (Robert T. Johnson, District Attorney, Bronx County, Peter D. Coddington and Anthony J. Girese, Assistant District Attorneys, New York City, of counsel), for Respondents–Appellants.

Mark F. Pomerantz, New York City (Warren L. Feldman, Rogers & Wells, New York City, David T. Grudberg, Jacobs, Grudberg, Belt & Dow, New Haven, CT, of counsel), for Petitioner–Appellee.

Before: OAKES, KEARSE and LEVAL, Circuit Judges.

:LEVAL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York, Robert J. Ward, *Judge*, granting Sheila Ryan DeLuca's petition for a writ of habeas corpus, setting aside her New York state court conviction for murder in the second degree, and ordering a new trial. *See DeLuca v. Lord*, 858 F.Supp. 1330 (S.D.N.Y.1994). The district court granted the petition on the grounds that DeLuca's counsel in her state court trial was ineffective in two respects: first, in failing to adequately investigate, prepare for, and advise DeLuca of a possible defense based on extreme emotional disturbance ("EED"); and second, in failing to advise DeLuca that it was up to her to decide whether to testify in her own defense. The People challenge both findings.

We conclude that the record fully supported the district court's finding that the EED defense was of great potential importance to DeLuca's case, that assertion of this defense would have been likely to produce a more favorable result for DeLuca, and that, in abandoning all consideration of this defense at an early stage and for no adequate reason, her counsel failed to deliver effective representation. We affirm on that basis.

## I. *Background*

### A. *Proceedings in State Court*

#### 1. *The People's Case*

DeLuca was indicted for the murder of Robert Bissett. She was tried in the New York State Supreme Court for Bronx County. The evidence presented by the People was essentially as follows:

On the evening of September 21, 1982, Sheila DeLuca met with friends at a bar in the Bronx. In the early morning hours, she left the bar with a friend, Karyn Travelino, and went to an after-hours club, arriving at approximately 5:00 a.m. There they were approached by Robert Bissett, whom they did not know. Later, at approximately 6:30 a.m., DeLuca and Travelino left the club with Bissett and his friends Eugene Murphy and Robert Barrett. Michael Belloise, the blackjack dealer at the club, testified that he held the door open for them as they left and overheard DeLuca say to one of the men that "he shouldn't have called her girlfriend a dyke." Five or ten minutes later, DeLuca returned to use the bathroom. As she was leaving the bar for the second time, Belloise heard her say to two other patrons, "I'm an ex-cop and these guys better not fuck with me because I'll kill them."

Murphy and Barrett testified that when they left the bar, Bissett let them into his van, told them to wait, and then drove off with DeLuca and Travelino in DeLuca's blue Cadillac. About a half-hour later, DeLuca and Bissett returned without Travelino. Murphy and Bissett got into DeLuca's car, and DeLuca and the three men began driving around and drinking sparkling wine. Barrett testified that DeLuca and Bissett seemed to "hit it off." The group continued to drive around, drinking and smoking marijuana.

At approximately 10:00 a.m., DeLuca, Bissett, Murphy, and Barrett drove into the Bronx Park Motel. Bissett rented a room and requested an X-rated movie from the desk clerk. At first, Barrett and Murphy went into the room while Bissett and DeLuca stayed in the car. Bissett then went to the room and asked the other two men to leave so that he and DeLuca could be alone. Mur-phy and Barrett left, but soon got bored and angry. They yelled "Let's go," and kicked in a hotel window. The hotel's manager then evicted them from the room. The hotel manager testified that he saw Bissett and DeLuca go back to the car. Bissett then returned briefly to the hotel room, leaving his companion alone in the car for approximately two minutes.

At around 1:00 to 1:30 p.m. that afternoon, three city maintenance workers observed Bissett's van parked in a large puddle of water in an empty lot adjacent to the Major Deegan Expressway. They saw the van move up and down and joked that someone must be having sex inside. Shortly thereafter, two of the workers saw a heavyset woman with short blond hair walking unsteadily away from the van up a hill towards a service road. This description roughly matched DeLuca's appearance. The workers testified that there was a fairly high level of noise in the area due to nearby construction, and that they did not hear any gunshots.

Anne O'Byrne, DeLuca's housekeeper, was at DeLuca's house on September 22, 1982. She testified that Peter DeLuca had been out looking for his wife. Sometime around 2:20 p.m., DeLuca arrived at the house in her car, followed almost immediately by Peter DeLuca. Sheila changed clothes and directed O'Byrne to clean the basement. While O'Byrne was in the basement, she heard the DeLucas speaking in high-pitched tones. When O'Byrne was finished, she went upstairs and had a brief conversation with the DeLucas, after which Peter drove O'Byrne home around 4:30 p.m.

Around 7:00 p.m., Peter DeLuca called the police. He told the police that there was a dead body in a van parked in a vacant lot adjacent to the Major Deegan Expressway, and that the deceased had raped his wife. Sergeant Eberhardt, an officer in the Bronx Sex Crimes Squad, called the DeLuca residence and spoke with Sheila DeLuca. The prosecution offered Sergeant Eberhardt's testimony as to what DeLuca told him as a fabrication on DeLuca's part evidencing consciousness of guilt about the murder. He testified DeLuca told him that three men

forced her into a van and took her to a hotel, where they told her that she would have to have sex with each of them; that one of the men then forced her back into the van and drove her to a lot near the Major Deegan Expressway, where he raped her in the back of the van; and that she hit him on the head with a bottle and fled. DeLuca refused to say anything more without advice of counsel.

The police found Bissett's body slumped face down between the front bucket seats of the van, feet behind him, with his hands underneath his body. Medical evidence showed that Bissett had been shot four times in the right side of his head at close range. The bullet wounds were closely spaced and in line. The medical examiner testified that Bissett had a bruise on the top of his head that was consistent with his being struck with a bottle. The medical examiner also testified that she was unable to establish the time of death because the body had been refrigerated prior to examination.

The police proceeded from the crime scene to DeLuca's residence, where DeLuca gave the police the clothes she had been wearing the night before. Tests later showed that seminal fluid found on DeLuca's torn underpants came from a man with the same blood type as Bissett. Later that night, Peter DeLuca handed the police a .38 caliber revolver that was registered under Sheila DeLuca's name, telling the police "This is the gun you're here for." Ballistics tests confirmed that this was the weapon that killed Bissett.

Based on this evidence, the prosecutor contended that DeLuca had engaged in a partying spree that began in a Bronx bar with Travelino and continued when she joined Bissett and his friends the next morning, and that DeLuca willingly went with Bissett and the others to the Bronx motel and later to Bissett's van, where she had sex with him and murdered him. DeLuca was portrayed as a sinister figure—an older woman who lured her young prey into a sexual assignation and then killed him.

### 2. DeLuca's Defense

The defense sought to call one witness, Flora Colao, an expert on rape trauma. The court refused to allow Colao to testify, as the defense had introduced no evidence DeLuca had been raped. The defense rested without calling any witnesses.

The jury found DeLuca guilty of second degree murder. She was sentenced to a term of 20 years to life in prison. Her conviction was upheld on direct appeal, and leave to appeal to the New York Court of Appeals was denied. DeLuca's conviction became final on February 24, 1986, when her petition for certiorari to the United States Supreme Court was denied. DeLuca made a post-conviction motion to vacate the judgment under N.Y.Crim.Pro.L. § 440.10, arguing that she was denied effective assistance of counsel. The motion was denied, as was her request for leave to appeal.

### B. DeLuca's Petition for Habeas Corpus

On June 1, 1990, DeLuca petitioned for a writ of habeas corpus in the United States District Court for the Southern District of New York. Her contentions included the claim that she was denied effective assistance of counsel. Judge Ward referred the case to Magistrate Judge Kathleen Roberts for an evidentiary hearing on DeLuca's claim of ineffective assistance. At the hearing, DeLuca testified about the events surrounding Bissett's death for the first time. Her testimony depicts the events in a very different light from the trial testimony of Murphy and Barrett.

### 1. DeLuca's Personal History

Concerning her personal life, DeLuca testified that she was a lesbian, and that she had not had sexual relations with a male since early in her youth. There was testimony from her lawyer to the effect that she had been sexually abused as a child.

Before becoming a policewoman, Sheila had studied at Hunter and Radcliffe colleges and had entered a Franciscan religious order, where she remained for about two years. She had also been an elementary school teacher. She then became one of New York City's first woman police officers and spent 15 years on the force before retiring in 1982. On the police force, she became friendly with

Peter DeLuca, a police captain 13 years her senior. When his first wife died, Peter De-Luca married Sheila with full knowledge of her sexual orientation; their relationship was based on friendship and did not involve sex.

### 2. DeLuca's Account of Bissett's Death

DeLuca testified that on September 21, 1982, there had been a party for her at Pauline's Bar & Grill celebrating her birthday, her retirement, and her team's victory in the Kingsbridge women's softball league. She had taken her husband home early because he was ill, but he had insisted that she return as she was the guest of honor. Later, she and Karyn Travelino had gone to an after hours club, where Bissett, Barrett, and Murphy approached them and offered to buy them drinks. When the women declined, the men became angry, calling them "dykes" and "lesbians." DeLuca told the men to leave them alone and moved away to play blackjack for the next two hours. Travelino eventually went home. Shortly thereafter, DeLuca left the bar and was accosted outside by Bissett and his friends. They threatened her and forced her into her car. In the car, one of the men threatened her with a knife.

The three men ordered her to drive around the Bronx, while the men drank, smoked marijuana, snorted a white powder, and told her of prior sexual exploits, including "gangbangs" and an incident where they had tied a woman to a bed. DeLuca did not respond, prompting Bissett to comment that she did not seem cooperative "like the others," and that killing was "nothing" to him because he had killed before.

When they arrived at the Bronx motel, Bissett told her that she was going to have sex with all three men, and that she would be killed if she did not cooperate. Seeking to separate them, DeLuca told Bissett that she would cooperate with him if Murphy and Barrett were not present. Bissett told Murphy and Barrett to leave the room, and they reluctantly left. When she continued to resist Bissett, he smashed her, saying he had warned her. Murphy and Barrett soon became rowdy, which caused their eviction. Bissett was furious. He took Sheila out of the hotel room and forced her to drive him

back to the after-hours club, where Bissett's van was still parked. Bissett shoved her into the back of the van and drove to the abandoned area beside the Major Deegan Expressway.

Bissett then punched her, threw her down in the back of the van, forced her to have oral sex, attempted unsuccessfully to have anal sex, and then raped her. Eventually, she hit him on the head with a bottle and fled. She called her husband from a phone booth and asked him to come for her, but later realized that she had given him incorrect directions. She walked to her car and drove home. On her way home, she encountered Travelino. DeLuca told Travelino she had been raped, but pleaded with her not to tell anyone. When Travelino asked her why she did not kill the rapist, DeLuca said she did not have a gun. DeLuca left Travelino and continued home.

DeLuca arrived home just before her husband. At first, she did not tell her husband what had happened, but later, after Peter drove the housekeeper home around 4:30 p.m., she broke down. Crying and shaking, she told her husband of her abduction and rape. They decided to go to a hospital because she was in pain and feared venereal disease. Peter wanted her to report the rape to the police, but Sheila resisted, fearing that friends on the police force would find out. Peter then said he would report the incident himself, but that he needed to know where the rape occurred. Although Sheila could not describe the location exactly, she directed him to the site on the way to the hospital. Because she was feeling shaken and vulnerable, DeLuca took her service revolver with her.

When they arrived at the vacant lot beside the Major Deegan Expressway, they found to their surprise that Bissett's van was still there. Peter DeLuca got out of the car and approached the van on the driver's side. DeLuca approached the van on the passenger side and drew her gun. They opened both front doors. At first they did not see Bissett. Bissett suddenly lunged forward from inside the back of the van and knocked Peter away from the driver's side door. Bissett then grabbed Sheila's arm and tried to drag

her into the van, saying he was going to kill her. Sheila shot Bissett several times. The DeLucas drove home, and Peter DeLuca called the police.

### 3. *Corroborating Evidence*

DeLuca introduced evidence that tended to corroborate her version of the events. As to DeLuca's claim of rape, a nurse who observed a gynecological examination of DeLuca on the night of September 22, 1982, could have testified at trial that she had vaginal bleeding and severe pain. 858 F.Supp. at 1339. Two days after the alleged rape, DeLuca's family physician examined her, took photographs, and later signed an affidavit stating that DeLuca had many bruises on her body, particularly on her breasts and thighs, which he did not believe were self-inflicted. 858 F.Supp. at 1339. A young woman, Elizabeth Kochovos, was prepared to testify at DeLuca's trial that Bissett had abducted and assaulted Kochovos, and that she had not pressed charges because Bissett's mother had prevailed on her mother, saying that her son was sick and was being sent to Arizona for treatment. Flora Colao, the rape trauma expert whose testimony was excluded at DeLuca's trial, testified that DeLuca's behavior after the alleged rape was consistent with rape trauma. The evidence showed that Peter DeLuca, who had died by the time of the habeas hearing, and Travelino had been available at the time of trial to corroborate Sheila's testimony.

### 4. *Testimony on Trial Strategy*

DeLuca's trial attorney John Patten testified that his strategy at trial was to choose between two possible defenses. The first defense was to rely on the state's inability to prove that it was DeLuca, as opposed to her husband, who had killed Bissett. This strategy was supported by Peter DeLuca's access to the murder weapon, his motive to kill regardless whether the sex between Bissett and DeLuca had been forced or consensual, and the police's inability to ascertain the exact time of death due to the refrigeration of Bissett's body. They could follow this strategy only if Sheila did not take the stand, as her testimony would have admitted her

killing of Bissett. The second strategy was to seek an acquittal based on justification, on the theory that, when Bissett grabbed her upon her return to the van and threatened to kill her, she shot him in self-defense.

Patten's testimony showed that he had rapidly, at an early stage, abandoned consideration of a defense based on extreme emotional disturbance. He testified that, in the course of explaining the defense of temporary insanity, he had explained EED to Sheila and told her that it would not result in acquittal but rather a reduction from murder to manslaughter in the first degree. "Whether she understood me or not, I don't know." He testified, however, that he dropped consideration of the EED defense because his client had an "absolute aversion to going to psychiatrists," and had refused to see Dr. Daniel Schwartz, a psychiatrist whom Patten had consulted.

DeLuca testified that Patten "implied that [EED] was an insanity defense, that if I were to see a psychiatrist and he were to say that at the particular time I was not in my right mind, that ... I would be institutionalized.... He didn't use those words, but that's what was going through my mind." According to DeLuca, Patten explained the defense by providing an example of a police officer who had shot a boy, pled temporary insanity, and was institutionalized for less than a year. DeLuca refused to consider a defense based on insanity because she did not consider herself crazy. DeLuca further testified that she told Patten she was willing to see a psychiatrist.

The decision as to whether DeLuca would testify was made at lunch following the close of the People's case, and after the trial judge had rejected the defense's proffer of the testimony of Colao on rape trauma syndrome. The choice was whether to keep DeLuca off the stand and try for an acquittal based on the People's failure to exclude Peter DeLuca as a possible killer, or to put DeLuca on the stand and try for acquittal based on self-defense. At this point, there was no discussion or consideration of an EED strategy, as Patten had long before abandoned it by reason of his client's supposed aversion to psychiatrists.

Patten decided it would be best not to present a defense. This decision surprised DeLuca. Throughout the trial, DeLuca believed that Patten would mount a defense and that she would take the stand. She felt that the jury would want to hear her story, and that she had nothing to hide. Patten, however, advised DeLuca "very strongly" not to take the stand. Patten never advised DeLuca that it was ultimately her decision whether to testify. DeLuca did not think that Patten's decision was sound strategically. Nevertheless, she "cowered" and acquiesced, believing that the decision whether to testify was for her attorney to make. In her view, "[Patten] was the attorney, he made the decisions."

### 5. *The Magistrate Judge's Recommendation*

Magistrate Judge Roberts recommended that DeLuca's habeas petition be denied. With respect to the issue of the EED defense, her recommendation to deny the writ was based primarily on the following findings:

> In light of petitioner's training and experience as a police officer, her claim that she did not understand the difference between an EED defense and an insanity defense ... is simply incredible.... I find that she clearly understood the EED option, and rejected it because of her aversion to psychiatrists, because it would have required her to admit the shooting, and because even if successful, the EED defense would have resulted in a manslaughter conviction.

### 6. *The District Court's Opinion*

Judge Ward rejected the Magistrate Judge's recommendations. He found that Patten's representation was deficient (1) because he failed to consider adequately, to explain properly to his client, or even to understand, the EED defense and its potential importance to her case, and (2) because he failed to explain to DeLuca that it was up to her, not her attorney, to decide whether she would testify. The district court granted DeLuca's petition for a writ of habeas corpus

and ordered a new trial. The People appealed.

### II. *Discussion*

■■■ A convicted defendant asserting a claim of ineffective assistance must meet a difficult two-part test. The defendant must first show that counsel's performance was objectively unreasonable under prevailing professional standards. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In assessing the reasonableness of counsel's performance, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. at 2065. For these reasons, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

■■■ Second, even if counsel's performance is found wanting under this standard, there is no violation of the Sixth Amendment unless counsel's deficient performance was prejudicial to the defendant's case. To demonstrate prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2055–56.

### A. *Objectively Reasonable Assistance*

Following these principles, we conclude that Judge Ward had an ample basis for finding that DeLuca did not receive objectively reasonable assistance of counsel. His conclusion that Patten's failure to adequately consider a possible EED defense constituted objectively unreasonable performance relied on subsidiary findings which are well supported by the record.

### 1. *The Importance of an EED Defense*

Judge Ward found that EED was of great potential importance to the strategy of De-

Luca's defense. This was undoubtedly true. The EED defense was well suited to the facts DeLuca had narrated to Patten. De-Luca's version of the facts, furthermore, were more than plausible.

■ Under New York law, extreme emotional disturbance is a partial affirmative defense to murder in the second degree. N.Y.Penal Law § 125.25(1)(a). It is available where "[t]he defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.; see also People v. White,* 79 N.Y.2d 900, 581 N.Y.S.2d 651, 652, 590 N.E.2d 236, 237 (1992); *People v. Moye,* 66 N.Y.2d 887, 498 N.Y.S.2d 767, 769, 489 N.E.2d 736, 737–38 (1985). The purpose of the EED defense is to allow the defendant to prove reduced culpability for a homicide because of the influence of emotional trauma. *See People v. Casassa,* 49 N.Y.2d 668, 427 N.Y.S.2d 769, 772–73, 404 N.E.2d 1310, 1313–15 (1980); *People v. Patterson,* 39 N.Y.2d 288, 383 N.Y.S.2d 573, 582, 347 N.E.2d 898, 907–08 (1976), *aff'd sub nom. Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). A defendant's proof that the killing occurred under the influence of an extreme emotional disturbance does not lead to acquittal, but reduces the crime upon conviction from murder to manslaughter in the first degree. *See Casassa,* 427 N.Y.S.2d at 772–73, 404 N.E.2d at 1313–15; N.Y.Penal Law § 125.25(1)(a).

■ Under the EED defense, if DeLuca proved that she killed Bissett while suffering from extreme emotional trauma resulting from being raped by him, this would have reduced her liability from second degree murder to first degree manslaughter. In making her case, DeLuca need not have presented proof of insanity, *see Patterson,* 383 N.Y.S.2d at 582, 347 N.E.2d at 907, nor would she have been required to present psychiatric testimony. *See Moye,* 498 N.Y.S.2d at 769, 489 N.E.2d at 738 (psychiatric testimony not necessary to warrant jury charge on EED defense). Nor was the passage of time between the rape and DeLuca's return to the van inconsistent with an EED defense. As the New York Court of Appeals has observed, "[a]n action influenced by an extreme emotional disturbance is not one that is necessarily ... spontaneously undertaken." *Patterson,* 383 N.Y.S.2d at 582, 347 N.E.2d at 908.

The potential importance of EED to De-Luca's trial was obvious. If it succeeded, she would have been convicted only of manslaughter and would have received a substantially lower sentence. Moreover, upon a realistic appraisal of the strength of the People's case, and of the other defenses contemplated by Patten, it offered the only realistic escape from the likelihood of a conviction for murder in the second degree.

Neither of the defenses prepared by Patten offered any significant likelihood of acquittal. The reasonable doubt defense relied on Patten's belief that the People's proof failed to eliminate the possibility that Bissett was killed by DeLuca's husband. But Sheila DeLuca was very powerfully implicated by the evidence presented to the jury. The testimony of Barrett and Murphy was to the effect that she had spent the morning driving around with them, partying, and had gone to the motel room apparently expecting to have sex with all three of them, which would have happened but for their eviction for rowdiness. The circumstances showed that she and Bissett had moved from her car to his van, apparently for the purpose of having sex in it, and had gone in the van to a vacant lot and had had sex there. She was seen leaving the van alone. Bissett was found dead— killed by her revolver. The prosecution's evidence, furthermore, presented her in a particularly sinister light—as a "black widow" who lured men into sexual relationships and then killed them. The trial evidence showed no apparent redeeming qualities, nor reason to doubt that she was guilty of second degree murder.

There was little likelihood of acquittal based on a doubt as to whether Peter had killed Bissett. The defense offered no evidence suggesting that Peter DeLuca might have been the killer. And the evidence presented by the prosecution virtually ruled out Peter DeLuca as a suspect; for under the prosecution's version of the events, it was unlikely that Peter had any opportunity to kill Bissett. Absent DeLuca's testimony

about being raped and knocking out Bissett with the bottle, there was no reason for the jury to believe that Bissett would have remained at a dirt lot at the side of the Deegan Expressway for long after he and DeLuca had had sex and she had left, unless it was because DeLuca had already killed him. Thus, the evidence before the jury suggested that Bissett had been killed at about 1:30 p.m., immediately after Bissett and DeLuca had sex in the van and before she returned home. It would have appeared unlikely to the jury that her husband had an opportunity to kill Bissett; furthermore, in his summation, Patten never directly argued to the jury that Peter might plausibly have been the killer. On a realistic appraisal of the People's case, DeLuca had very little hope of escaping conviction for murder on grounds of reasonable doubt.

The defense of justification was even less promising. This defense required DeLuca to take the stand and admit to killing Bissett. Her admission that she approached the van with gun drawn, while her husband approached from the other side, was highly suggestive of intentional murder. Indeed, given her approach with gun drawn several hours after the claimed rape, she might not even have been entitled to a charge on self-defense, as an aggressor in a conflict resulting in death may not claim self-defense. *See* N.Y.Penal Law § 35.15(1)(b) (aggressor may not claim self-defense); *United States v. Thomas,* 34 F.3d 44, 48 (2d Cir.1994); *People v. Graydon,* 43 A.D.2d 842, 351 N.Y.S.2d 172, 173 (2d Dep't 1974).

Without the EED defense, DeLuca faced two very bleak options. The People's evidence presented a compelling case of murder, showing her in a most unsympathetic light. If she testified, she could present a far more sympathetic picture of herself; but, unless the EED defense were included, her testimony would practically amount to a confession of murder.

Only by presenting the EED defense could she take advantage of the benefits of testifying. Her testimony that she was a former nun and a lesbian who, since being abused as a child, had never had sexual relations with men, would have strongly rebutted the prosecution's black widow theory. She would have presented a plausible and corroborated claim of rape. Although giving up any hope of acquittal based on reasonable doubt, the EED defense would have presented a powerful reason for the jury to limit her liability to manslaughter. It appears to have offered her only realistic hope to escape being convicted of murder. Furthermore, presentation of the EED defense did not require giving up the defense of justification. She could have presented both in tandem.

In these circumstances, there can be no doubt that Judge Ward was justified in concluding that the EED defense was of great potential importance to DeLuca's case.

### 2. *Patten's Abandonment of the EED Defense*

Judge Ward found that, rather than preparing for the possibility of presenting the EED defense, Patten abandoned it early for completely inadequate reasons. This finding was well supported. Patten testified essentially that they had never thought seriously of presenting an EED defense and that he had discarded it early because of his client's aversion to psychiatrists. The district court found that this was unreasonably deficient counselling, for several different reasons.

Judge Ward found it likely that Patten himself had not properly understood the defense. This finding was strongly supported by Patten's testimony that he could not investigate the EED defense without Sheila agreeing to see a psychiatrist. This suggests he misunderstood the defense to relate to a type of mental illness less extreme than insanity. A defense of extreme emotional disturbance does not require the testimony of a psychiatrist. *Moye,* 498 N.Y.S.2d at 769, 489 N.E.2d at 738. Even if DeLuca really had a pathological aversion that would have prevented her from seeing a psychiatrist in preparation for her defense, a highly convincing EED defense could nonetheless have been prepared on the basis of her having

been abducted, threatened, beaten, shoved, abused, and raped.[1]

That Patten misunderstood the defense was corroborated by DeLuca's understanding of what Patten had explained to her. She testified that she understood from Patten that an EED claim was a form of insanity defense. According to her testimony, Patten explained the EED defense in the context of discussing possible insanity defenses, and illustrated the concept with an example "of a police officer who had shot a young boy and pleaded temporary insanity and went to an institution for less than a year and he's out walking now."

Regardless whether the district court should be credited in its finding that DeLuca misunderstood the nature of the EED defense,[2] there was ample basis for its finding that Patten rejected the EED defense prematurely, for inadequate reasons, and without ever giving it serious consideration. Patten testified that he relied on the reasonable doubt and justification defenses "from the beginning." When asked to state when he decided not to pursue EED, Patten stated, "I don't believe we ever decided to present it at all. . . . We were going with the—either no defense, or the defense of justification." The fair import of Patten's testimony is, as the district court found, that Patten never weighed the merits of an EED defense and discarded it at a very early stage in the trial planning process.

This conclusion is supported by the testimony of other members of the defense team. Although Patten stated that he "probably" discussed EED with Dr. Schwartz, Dr. Schwartz's notes indicate that the only defenses discussed were ones based on reasonable doubt and self-defense. Patten also consulted Ellen Yaroshefsky, a legal specialist in battered women's self-defense cases, and Flora Colao, an expert on rape trauma, both of whose expertise would presumably have been useful in preparing an EED defense. Yet both experts testified that Patten never mentioned a possible EED defense during their consultation. 858 F.Supp. at 1348.

It was Patten's obligation as counsel to prepare such an important defense for possible use when the time came to decide whether to present a defense and whether the defendant should testify. Because EED had been discarded at the start, it was not under consideration when Patten and his client made these crucial decisions after the presentation of the People's evidence. Furthermore, as noted above, any reluctance of De-

---

1. The dissenting opinion quotes a passage from *People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678, 688–89 (2d Dep't 1985), to the effect that a psychiatrist's testimony would have been necessary for the defendant to succeed in establishing an EED defense. We read this passage as a comment on the very different dynamics of the evidence submitted to that jury and not as a generalized statement on the law of New York. The court clearly said at the beginning of the quoted passage that psychiatric testimony is not legally required. *Id.* 491 N.Y.S.2d at 688. If the jury in this case believed that Bissett had raped DeLuca, it would not have needed a psychiatrist's help to understand that she might have killed him in a state of extreme emotional disturbance.

2. The People contend that reversal is required because the district court made determinations of credibility, contrary to the determinations of the magistrate, without hearing the testimony firsthand. Although there is authority for this argument, see *United States v. Raddatz*, 447 U.S. 667, 681 n. 7, 100 S.Ct. 2406, 2415 n. 7, 65 L.Ed.2d 424 (1980); *Grassia v. Scully*, 892 F.2d 16, 19–20 (2d Cir.1989), it has no force here. Our finding of ineffective assistance does not depend on disputed issues of credibility.

The magistrate found that DeLuca "clearly understood the EED option, and rejected it because of her aversion to psychiatrists, because it would have required her to admit the shooting, and because even if successful, the EED defense would have resulted in a manslaughter conviction." These findings supported the magistrate's conclusion that DeLuca suffered no prejudice.

However, our holding does not turn on whether DeLuca properly understood the EED defense. The point is rather that Patten rendered ineffective assistance by abandoning EED for inadequate reasons at an early stage, so that, when the time came at the close of the prosecution's case to decide whether DeLuca would testify, EED was not among the options to be considered. As to this holding, the magistrate judge's findings are largely irrelevant. Even if it were true that DeLuca understood and rejected EED when it was raised in the early stages of preparation, that says nothing about what her decision would have been had EED been available to her after the prosecution had presented its case. And even if DeLuca did have an aversion to psychiatrists, that was not a justifiable basis for failing to consider an EED defense.

Luca to see a psychiatrist was an inadequate reason for discarding EED, as the defense could have been effectively presented without requiring her to see a psychiatrist.

In short, we agree with the district court that Patten's disregard of the EED defense fell below what was required by prevailing professional standards of conduct. In view of the powerful evidence presented by the prosecution and the weakness of the reasonable doubt and justification defenses, a defense based on EED offered virtually the only realistic chance of avoiding a conviction for second degree murder.

We emphasize that our finding of deficient performance does not rest on judicial disagreement with a reasoned strategic decision of trial counsel. Had Patten made a considered decision, after investigation, not to pursue an EED defense, we would be extremely reluctant to second-guess that decision. As the Supreme Court has stated, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Indeed, had Patten made a reasoned strategic decision to drop the EED defense even at an early stage, it would give us considerable pause to question such a decision. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. at 2066. In our view, Patten's abandonment of the EED defense was so hasty and based on so little, that in light of the obvious likely benefits that could be gained from the defense, his decision cannot be considered either a reasonable professional judgment or a reasoned strategic choice.[3]

## B. *Prejudice*

■ The district judge concluded that DeLuca was prejudiced by her lawyer's failure to prepare the EED defense as a viable possibility. This conclusion involved two steps. First, Judge Ward found that, had the EED defense been adequately explained to her, she would have taken the stand, as had been her intention all along. Second, the judge found that her taking the stand and asserting the EED defense would have been likely to change the result of the trial.

As to the first step, we do not believe it is quite as simple as the district court suggested. There was unquestionably a disadvantage to DeLuca's taking the stand. By doing so, she would admit to shooting Bissett and eliminate any doubt as to whether it was her husband who did the killing. Furthermore, as the People point out, at the conclusion of the prosecution's case her attorney was optimistic about the hope of an acquittal based on reasonable doubt and was opposed to her taking the stand. Nonetheless, considering the question to be a close one, we conclude that DeLuca was prejudiced by her attorney's unjustified abandonment of the EED theory. We believe there is a reasonable probability that the preservation of EED as a viable option would have led to her taking the stand and to a different result.

Patten's optimism in the face of two dismal alternatives leaves us somewhat perplexed. It is perhaps to be explained by the fact that as between reasonable doubt and self-defense, the reasonable doubt route was slightly less dismal. As stated above, the self-defense theory would have required his client to admit the killing and give up any hope of an acquittal based on reasonable doubt, but receive no valuable benefits in exchange. The fact that counsel was optimistic in the face of two choices, one slightly less dismal than the other, does not necessarily mean that this optimism would have persisted had he faced a third alternative that offered substantial and likely benefits. Had the EED defense remained available as an option, Patten might well have recognized how preferable it was to the two hopeless options before him. He could preserve the opportunity to try for a self-defense acquittal (for whatever that was worth), while adding a strong likeli-

---

3. In our view, this case differs substantially from a garden variety allegation of ineffective representation based on counsel's failure to explore sufficiently a defendant's improbable claim of alibi. A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision.

hood of reducing DeLuca's exposure from murder to manslaughter. We see no reason to conclude from Patten's expressed optimism when he had no attractive choices that he would have been blind to the enormous advantages to be gained from DeLuca's testimony offered in support of an EED defense.

Had EED remained under consideration, Patten would have been forced to make a realistic assessment of the likelihood of a reasonable doubt acquittal.[4] Patten and DeLuca would then have had to consider the enormous potential benefits that would result from a manslaughter conviction as opposed to a likely murder conviction. We think there is a reasonable probability that Patten's assessment of the choice might well have been very different. We therefore think there is a reasonable probability that retention of the EED defense, as an option to consider when DeLuca and her attorney were making the decision whether she would testify, would have led them to change that decision and to place her on the stand.

On the second issue, Judge Ward found that, if the jury had heard DeLuca's testimony and considered the question of EED, there was a high likelihood it would have accepted the defense and reached a verdict of manslaughter rather than murder. We think this finding was well supported by the evidence.

A successful EED defense requires proof of two elements: (1) that there was an objectively reasonable explanation or excuse for the emotional disturbance; and (2) that the defendant's conduct was influenced by an extreme emotional disturbance at the time the crime was committed. *See People v. White*, 79 N.Y.2d 900, 581 N.Y.S.2d 651, 652–53, 590 N.E.2d 236, 237–38 (1992).

It was perfectly reasonable for the district court to find that the jury would have been likely to accept DeLuca's testimony that she was raped. The evidence of rape was strong, and the evidence of DeLuca's background and sexual history made the testimony of Bissett's friends highly suspect. Her ac-

count of the assault, furthermore, was corroborated by Peter DeLuca and Travelino on significant points, as well as by evidence showing that her underpants were torn, that she had vaginal bleeding, and that she had bruises on her thighs and breasts.

The People respond that DeLuca would have been vulnerable to cross-examination on aspects of her testimony that are inconsistent with other evidence. They point particularly to testimony of Bissett's mother that he had come home during the morning with a woman who used the bathroom, evidence that during the same morning Bissett bought paint at a paint store, the testimony of the motel manager that DeLuca was left alone by Bissett in her car for two minutes while he returned to the room, and the general improbability that she would have been unable to free herself as she drove the car for hours prior to the visit to the motel. The People argue these episodes were inconsistent with her claim of abduction.

We are not particularly impressed by these arguments. As to the evidence of her going to Bissett's house to use the bathroom, it is not inconsistent with her claim of being abducted. Bissett's house is hardly the place she would have made a break for freedom. Whether she remembered such a stop in her testimony years later is of little significance. Furthermore, Bissett's mother's testimony was not especially reliable. She had an obvious motive to harm DeLuca by her testimony. There was evidence, furthermore, that she had previously interceded to protect her son from rape charges when he had assaulted another woman. Bissett's visit to the paint store does not seem probative either way on the issue of abduction.

As to DeLuca's being left alone in her car for two minutes at the motel, that is indeed somewhat troublesome. There is, of course, no reason to assume she had the keys to the car. Nonetheless, she might have run to the motel manager's office for protection from Bissett. Likewise, we recognize that there is some improbability that a woman with 15

---

4. In response to the argument in the dissent, we do not read the trial judge's setting up an exit route for DeLuca in the event of acquittal as indicating that the judge believed she would be acquitted. A prudent judge prepares for both eventualities, regardless of personal assessment of the probabilities.

years of police experience would not have found a way—by crashing the car or otherwise—to escape her predicament, if she was driving around the city for hours under duress. The People also argue that the position of Bissett's body and the neat alignment of the bullet holes in his head were inconsistent with DeLuca's story of her tussle with Bissett upon the return to the van. The People's argument is not unreasonable. The record does not show how DeLuca would have answered such cross-examination. As to her failure to escape, it may be she would have claimed to have been immobilized by terror. Furthermore, the jury was not required to accept DeLuca's testimony about the details of the killing in order to accept her claim that she killed Bissett in a state of extreme emotional disturbance.

These potential difficulties in the presentation of DeLuca's case do not undermine the district court's finding of prejudice. Notwithstanding some areas of possible doubt, we think there is a high likelihood that the jurors, or at least some of them, would have accepted DeLuca's claim that Bissett raped her, and that jurors who believed she had been raped would have been highly disposed to accept the EED defense and find manslaughter, rather than murder. The *Strickland* test does not require certainty that the result would have been different. The district court's task was to determine whether, but for counsel's deficient performance, there was a reasonable probability of a different outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In our view, the *Strickland* test of "reasonable probability" of a different outcome was easily met. *Id.*

We therefore affirm the district court's grant of habeas corpus, vacating DeLuca's conviction and permitting retrial. Because the failure to preserve and prepare for a defense of extreme emotional disturbance is sufficient basis for affirmance, we do not reach the district court's second ground.

## Conclusion

The district court's order granting a writ of habeas corpus is affirmed.

KEARSE, Circuit Judge, dissenting:

With all due respect, I disagree with the majority's assessment of DeLuca's trial counsel's performance. To establish a constitutional claim of ineffective assistance of counsel, a convicted defendant must show, *inter alia,* that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In assessing counsel's performance, we are neither to engage in second-guessing, nor to find constitutional violations in acts or omissions that might be considered sound tactics:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, ... the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

The threshold question in this habeas corpus proceeding was thus whether one could reasonably conclude that the performance of DeLuca's trial counsel John Patten, viewing the matter from his perspective at the time, fell below an objective standard of reasonableness. The majority faults Patten for not preparing an extreme emotional disturbance ("EED") defense, for not preferring an EED defense to the justification defense he did prepare, and for electing not to present any affirmative defense because of his judgment that the prosecution had not proven its case beyond a reasonable doubt. I do not see in any of these a less than objectively reasonable level of performance.

(a) *Rejecting the EED Defense for Lack of Psychiatric Support*

The majority's view is that counsel's performance was unconstitutionally deficient

principally because Patten "rejected the EED defense prematurely," Majority Opinion *ante* at 587, for the "inadequate" reason that he erroneously believed the testimony of a psychiatrist was necessary, *see id.* The majority's view of the EED defense, though technically accurate, is myopic. In *People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678 (1985), the New York court observed that the advice of trial counsel in that case that "it would be necessary for the defense to introduce psychiatric testimony to support the claim of EED" was "not wrong from a practical point of view":

> Concededly, psychiatric testimony would not be legally required for defendant to raise the defense.... Nonetheless, *if defendant had any hope of prevailing upon the defense,* she would have had to convince the jury by a preponderance of the evidence that the emotional explanation given for her conduct was a reasonable excuse.... Whatever other evidence may have been available to support the defense, *certainly a psychiatrist's testimony,* giving objective reasons why particular conduct was triggered, *would be most probative on the question, even de rigueur, in order to be successful, as a practical matter, with the jury.*

*Id.* at 362, 491 N.Y.S.2d at 688–89 (emphasis added). Accordingly, the *Harris* court concluded that "counsel's advice as to the practical necessity of psychiatric evidence ... was in no way erroneous." *Id.* at 363, 491 N.Y.S.2d at 689.

#### (b) *Preferring a Justification Defense to an EED Defense*

In faulting Patten for preferring a defense of justification to the EED defense, the majority states that the justification defense offered "no valuable benefits," Majority Opinion *ante* at 588, and that the EED defense "offered substantial and likely benefits," *id.* Yet a successful justification defense would have produced an acquittal; a successful EED defense would have yielded at best a first-degree manslaughter conviction.

#### (c) *Criticism of Justification for Reasons Also Applicable to EED*

Further, the majority finds that the justification defense preferred by Patten was not "promising" because

> [t]his defense required DeLuca to take the stand and admit to killing Bissett. Her admission that she approached the van with gun drawn, while her husband approached from the other side, was highly suggestive of intentional murder.

Majority Opinion *ante* at 586. Since the EED defense would likewise have required this testimony, surely counsel was entitled to view the EED defense—which had far less potential benefit than the justification defense—as not promising.

In my view, it would have been an uphill battle to persuade the jury of either of these defenses, assessing DeLuca's testimony in light of the photographs introduced at trial. To accept either defense, the jury would have had to believe, *inter alia,* that DeLuca, while being grabbed by Bissett and pulled off balance, managed to fire into his head four bullets, closely spaced and in a straight line.

#### (d) *Relying on Reasonable Doubt*

Finally, even if counsel should not have rejected the idea of the EED defense in the pretrial preparation stage, the more pertinent question is whether it was incompetent for him not to present that defense at trial. At trial, Patten believed the prosecution had not proven its case. Though the majority terms the possibility that the jury would acquit on grounds of reasonable doubt "dismal," Majority Opinion *ante* at 588, there can be no doubt that there were unusual weaknesses in the State's case. For example, the prosecution theorized that Bissett had been killed at about 1:30 p.m., *i.e.,* just before road workers in the area saw a woman who matched DeLuca's description walking away from the parking lot in which Bissett's van was located. But the prosecution could not prove the time of death because the police had refrigerated the body before it could be examined by the medical examiner. Further, prior to seeing the woman leaving, the road workers had noticed the van "rocking" and had theorized that sexual acts were be-

ing performed; but at no time did any of the workers hear any gunshots. Thus, it was inferable that Bissett was not shot before DeLuca left. There being no evidence that DeLuca returned, or that placed her at the scene of the crime at the time any shots were fired, the jury could well have found that there was a reasonable doubt that it was she, as opposed to her husband who also had access to her gun, who had committed the homicide.

In these circumstances, even had Patten prepared the EED defense, he would not have used it because his judgment was that if no affirmative defense were presented the jury could and would acquit on grounds of reasonable doubt. Patten testified that his view of the weakness in the prosecution's case was held by others as well, to such an extent that the trial judge had even ordered preparation of an exit route for DeLuca to use upon return of a verdict of acquittal:

> I had no doubt that if I put her on that stand, okay, that she would do well. [But] I didn't think you [sic] people made it. It was that simple. And I tell you, [Judge] Tonetti himself thought we made it. They had set up an exit route for us to leave the courthouse, because [Judge] Tonetti was concerned that if there was a verdict in favor of the defendant, that there would be a demonstration there. And [Judge] Tonetti himself had set up an exit route for us to leave down through chambers. There was that sense that we had made it. Obviously we didn't. But there was the sense at the time.
>
> Q. You talk about the sense. What did Judge Tonetti do that indicated to you that he had this sense that the case was not made?
>
> A. Judge Tonetti is a former DA from the Bronx and Manhattan, I believe. The atmosphere in his chambers was very relaxed between himself, myself and [Assistant District Attorney] Tony Shepis.
>
> There was [sic] times when we were in there informally together. In the course of that, [Judge] Tonetti indicated to us I think we should have a way that this woman can leave the courtroom. And we had

the sense that we had made it. And we were surprised that it went the other way.

> Q. You're saying "we." Who are you referring to?
>
> A. Meaning my partner, myself, Mrs. DeLuca, other people who I would speak to there. There was not this great sense of gloom. There was an upbeat sense. And it just didn't turn out that way.
>
> Q. And you had this sense that you had prevailed because of the weaknesses that you saw in the people's case?
>
> A. That's correct.

(Transcript of Habeas Corpus Hearing at 545–46.)

If the majority's finding of ineffectiveness is limited to counsel's failure to prepare an EED defense, and not to his failure to present it, surely the prejudice prong of the *Strickland* test, see 466 U.S. at 694, 104 S.Ct. at 2068 (requiring reasonable probability that outcome of proceeding would have been different but for counsel's unprofessional errors), has not been met, for it cannot be said that the jury would likely have acquitted just because counsel had prepared a defense he did not present.

In sum, in all the circumstances, I do not share the majority's view that the performance of trial counsel fell below an objective standard of reasonableness. When two defenses require much the same presentation of factual evidence and, if successful, one would produce acquittal whereas the other could achieve at best a conviction of first-degree manslaughter, counsel's preference for the defense that could achieve acquittal does not seem to me deficient. When counsel believed that in order to be successful an EED defense would require testimony of a type that the New York court agrees is "highly probative," "a practical necessity," and "de rigueur," one cannot reasonably call his tactical choice, premised on that belief, unconstitutionally defective. And when the trial judge had sufficient question about the persuasiveness of the State's case to suggest and prepare an exit route for the defendant upon the return of a verdict of not guilty, I think it constitutes pure hindsight to fault counsel for not introducing an affirmative defense that

would have filled the most obvious gap in the prosecution's case.