**Nit SHIWLOCHAN, Petitioner,**

v.

**Leonard A. PORTUONDO, Superintendent, Shawangunk Correctional Facility, Respondent.**

**No. CV 00–5405(DGT)(MDG).**

United States District Court,
E.D. New York.

Nov. 10, 2004.

Norman L. Reimer, Gould, Fishbein, Reimer LLP, New York, NY, for Petitioner.

Lisa Drury, Queens District Attorney's Office, Kew Gardens, NY, for Respondent.

## MEMORANDUM and ORDER

TRAGER, District Judge.

On December 31, 2003, United States Magistrate Judge Marilyn D. Go issued a Report and Recommendation in this matter, recommending that petitioner's sentence be reduced to fifteen years to life. Defendants timely filed an opposition to the Report and Recommendation. I affirm for the reasons given by Judge Go in her thorough memorandum.

Respondent requests I hold a *de novo* hearing. At first I was inclined to go along with this request, in part because I had, in another unrelated proceeding, found Mr. Blossner not credible. *U.S. v. Duran–Benitez*, 110 F.Supp.2d 133, 150 (E.D.N.Y.2000). On the other hand, if his testimony were accurate, it would indicate incompetence, to say the least. It would appear, therefore, that he had nothing to gain by this belated disclosure.

Accordingly, I decided to request information concerning Mr. Blossner's fee arrangements with the petitioner's family in order to determine if he had some ulterior motive for not conveying Judge Leahy's plea offer to the petitioner or perhaps to establish that in fact the alleged plea offer

in fact was never made. After examining the materials provided, it is clear Mr. Blossner gained no financial benefit from continuing with the trial. Therefore, I am inclined to accept his explanation as to why he never conveyed that plea offer to his client. He felt petitioner would not accept the plea offer because of the petitioner's insistence of innocence and that, in light of the circumstances under which the crime occurred and petitioner's lack of any prior record, Mr. Blossner believed petitioner, if found guilty at trial, would receive a fifteen years to life sentence rather than the forty-one and two thirds years to life sentence that he did receive.

Respondent also contends that there never was a plea offer. However, Judge Go's conclusion that Judge Leahy made such an offer seems perfectly reasonable. Since no further evidence is available, a *de novo* hearing is unnecessary.

As it is incontestable that Mr. Blossner had an absolute obligation to convey the offer and Magistrate Judge Go's finding that petitioner would have accepted the offer, the remedy she has offered is appropriate.

Accordingly, the Report and Recommendation of Magistrate Judge Go is hereby adopted. The Clerk of the Court is directed to close the case.

## REPORT AND RECOMMENDATION

GO, United States Magistrate Judge.

Petitioner Nit Shiwlochan seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition in this matter was referred to me by the Honorable David G. Trager to report and recommend. For the following reasons, I recommend that the petition be granted in part and denied in part, and that petitioner's sentence be reduced to 15 years.

## PROCEDURAL BACKGROUND

Nit Shiwlochan was charged with: one count of murder in the second degree, N.Y. Penal Law § 125.25[1], [3]; two counts of attempted murder in the second degree, §§ 110.00, 125.25[1]; criminal possession of a weapon in the second degree, § 265.03; assault in the first degree, § 120.10; assault in the second degree, § 120.05; and reckless endangerment in the first degree, § 120.25. After a jury trial before the Honorable John Leahy, petitioner was convicted of one count of murder in the second degree, § 125.25[1]; two counts of attempted murder in the second degree, § 110.00, 125.25[1]; and one count of criminal possession of a weapon in the second degree, § 265.03. He was sentenced to an indeterminate term of imprisonment of 25 years to life on the murder charge to run consecutively to two terms of imprisonment of 8 1/3 to 25 years on each of the attempted murder counts. He was also sentenced to a concurrent indeterminate term of imprisonment of 5 to 15 years on the weapon possession charge.

### Trial

A trial before a jury commenced on August 18, 1992.

In his opening statement, the prosecutor claimed petitioner shot three men, killing one and seriously injuring another, during an altercation at the Orealla Bar and Discotheque (the "Orealla") in Jamaica, Queens between eight male Indian patrons and Orealla staff. Trial Transcript ("Tr.") at 18–19. Although petitioner's brother was initially arrested for the crime, six witnesses, including a security guard at the Orealla who had known petitioner for three years, subsequently identified petitioner as the shooter. *Id.* at 20–21.

Defense counsel waived his right to deliver an opening statement.

*Prosecution's Case*

The prosecution called ten civilian witnesses: two security guards who worked at the Orealla, Jesse Leverette and Gerald Wright; five of the Indian men involved in the altercation; and three Orealla patrons unconnected to the Indian men, Carl Laguerre, Edwige Laguerre and Edward Colas. All five Indian men and Gerald Wright positively identified petitioner as the shooter. The prosecution's witnesses testified as follows.

Petitioner and his sister, Marla, managed the Orealla, which was owned by their family. *Id.* at 220, 418–19. On the night of December 20, 1991, petitioner was managing the club and his wife was working in the coatroom. *Id.* at 459–61. Also present, but not working that evening were the petitioner's brother, Venod, and "Cup" Singh, a friend. *Id.* at 419–21.

In the late evening or early the following morning, eight Indian men, Mahandra Latchama, Anthony Jaggernauth, Bernard Sonnie, Johnny Ali, Radesh Rambharose, Andre Jaggernauth, Ragindranath Mahelal and Sunil Gary, entered the Orealla. *Id.* at 174, 374, 317–18, 547, 591. Security guards Gerald Wright and Jesse Leverette searched the eight men but did not find any weapons. *Id.* at 176, 226–27, 321, 377, 425, 562. At the club entrance, the men were asked to remove their baseball caps pursuant to club policy, and they complied. *Id.* at 179, 261, 321, 378, 426–27, 552–53.

During the evening, some of the men put their baseball caps back on. *Id.* at 180, 325, 379, 427, 553. Wright also observed the men harassing and grabbing women on the dance floor. *Id.* at 463. Wright further testified that some of the men "called [petitioner's] wife a whore, bitch," and one said he "wanted to have sex with her." *Id.* at 461. As a result of the foregoing, Wright asked them to leave. *Id.* at 180, 326, 427, 553. Wright, petition-

er and "Cup" Singh then escorted the men to the entrance. *Id.* at 180, 427–28. As they reached the entrance, the men demanded their money back, but Wright refused. *Id.* at 180, 291, 326, 380, 429, 446. In an ensuing shoving match between the men and Orealla staff, Ali punched Wright in the face. *Id.* at 180, 190, 231, 429.

Petitioner, "in a rage," started shooting. *Id.* at 180–82, 326, 380, 388, 434–36, 479, 556, 598–600. Petitioner's first shot struck Rabindranath Mahelal in the forehead, killing him. *Id.* at 56, 355, 363. Carl Laguerre, a patron at the club, testified that he saw petitioner place the gun against Mahelal's forehead before firing. *Id.* at 56. The medical examiner, Dr. Algae Charlot, testified that the gun was not more than 18 inches from Mahelal's forehead when fired. *Id.* at 357.

Petitioner's second shot struck Andre Jaggernauth in the neck. *Id.* at 57. Carl Laguerre testified that petitioner held the gun against Jaggernauth's neck and fired while Jaggernauth's hands were in the air. *Id.* at 57, 60. As a result of the shooting, Jaggernauth is paralyzed from the neck down and breathes on a respirator. *Id.* at 395.

After shooting Mahelal and Jaggernauth, petitioner began "shooting all over." *Id.* at 296. Petitioner apparently shot at some of the club patrons as they fled, hitting Edward Colas in the leg. *Id.* at 182, 263, 271, 292.

A few minutes after the shooting, Police Officer Ramona Vicario interviewed Sunil Gary and Anthony Jaggernauth at the Orealla and obtained a description of the shooter. *Id.* at 135–37, 144. After Officer Vicario brought Gary and Anthony Jaggernauth to the back of the club, both pointed out petitioner's brother, Venod, who was wearing glasses, as resembling the shooter. *Id.* at 145. After Venod removed his

glasses, Gary and Anthony Jaggernauth confirmed that Venod looked like the shooter. *Id.* at 146. Ali also said that the shooter looked like Venod but did not wear glasses. *Id.* at 567, 577. As a result, Venod Shiwlochan was arrested and transported to the 103rd precinct. *Id.* at 146.

Later, Gerald Wright, who had known petitioner for three years, saw Venod in a holding cell at the 103rd precinct. *Id.* at 439. Wright told Detective Wenceslao Cortes that petitioner, not Venod, was the shooter. *Id.* at 417, 439. Wright testified that although he had previously told the police that he had not seen who fired the shots, he admitted the truth to Detective Cortes because he did not want to see Venod wrongly accused. *Id.* at 476, 485. Wright said that petitioner and Venod look very much alike except Venod wears eyeglasses and has a bald spot on the back of his head. *Id.* at 419, 421, 503, 519–20, 567. Wright also testified that he had seen petitioner with a .380 caliber handgun on many occasions, including the morning of the homicide. *Id.* at 435.

At approximately 8:15 a.m. on December 21, 1991, Police Officer Kevin Donahue and other officers searched for the shooter in the Orealla and the apartments located above it. *Id.* at 76–77. Although the search was unsuccessful, one officer remained to stand guard outside petitioner's apartment. *Id.* at 80.

At approximately 12:15 p.m., Police Officer Stephen Bergen, who was guarding petitioner's apartment, heard noises inside. *Id.* at 488–89. As he entered, Officer Bergen noticed a bulge in the drop ceiling and found petitioner hiding there. *Id.* at 492.

At approximately 6:31 p.m. on December 21, 1991, Sonnie, Anthony Jaggernauth, Ali

and Rambharose viewed a lineup at the precinct and identified petitioner as the gunman.[1] *Id.* at 187–88, 337–38, 393–94, 520–21, 570, 605. Sonnie, Jaggernauth, Ali and Rambharose all testified at trial that they saw petitioner fire the gun. *Id.* at 328, 330, 338, 386, 388, 413, 556–59, 598, 600. Wright testified that he saw petitioner "standing up against the wall [and] just kept on firing." *Id.* at 435. Latchama testified that he saw a gun in petitioner's hand and saw "flames" coming from the gun. *Id.* at 180–81. Carl Laguerre, who did not identify petitioner, testified that he saw a heavyset Indian man with a mustache "shooting all over the place." *Id.* at 55–58. Edwidge Laguerre could not identify the shooter at trial, but described the shooter as somewhat balding. *Id.* at 275.

Several of these witnesses have criminal histories. Latchama and Andre Jaggernauth were part of a robbery team operating in Queens County. *Id.* at 194, 197–98. At the time of the shooting, Latchama was free on bail on a robbery charge to which he subsequently pled guilty. *Id.* at 197–98. At the time of trial, Ali was on probation for auto theft, had a pending assault case and an open bench warrant. *Id.* at 582–85. Similarly, Rambharose was on probation for beating a man with a pipe and was the subject of an outstanding bench warrant. *Id.* at 613.

Gerald Wright also had been convicted of burglary, assault and possession of stolen property. *Id.* at 465–66. In addition, Wright had been diagnosed with paranoid schizophrenia and previously spent approximately seventeen years in mental hospitals. *Id.* at 458. He admitted he does not take his prescribed medication to control his condition. *Id.* at 469.

---

1. Prior to petitioner's arrival at the precinct, two witnesses identified Venod's photograph from a photo array. *Id.* at 529.

*Petitioner's Case*

Despite the testimony of six eyewitnesses, petitioner based his defense on a theory of misidentification.

Petitioner's father, Manbodhe Shiwlochan, testified that petitioner and Venod look alike, but Venod had a bald spot on the back of his head, is shorter and heavier and sometimes wore eyeglasses. *Id.* at 626, 629, 630–31, 638–39.

Petitioner's brother, Manoj Shiwlochan, testified that he was tending bar at the Orealla at the time of the shooting. *Id.* at 642–43. When he heard the shots, Manoj stated he clearly saw petitioner standing in the area between the dance floor and the bar, some distance from the entrance. *Id.* at 655–57, 671. Neith Rheingold and Michael Katwara, petitioner's nephews, did not witness the shooting but also claimed they saw petitioner clearing bottles and glasses from a table in the back of the club just before the shooting. *Id.* at 720, 722, 724, 727, 739, 790–91, 799, 814.

Petitioner testified that he did not shoot anyone at the club and denied possessing a gun. *Id.* at 857–58, 868, 879, 890. On the night of the shooting, he heard shots as he was walking near the entranceway. *Id.* at 868–69. Venod then ran towards petitioner and said, "Run, they're going to kill us." *Id.* at 869–70. Petitioner ran to the coatroom to check on his wife and, not finding her there, ran upstairs to look in his apartment. *Id.* at 870–73. Petitioner then heard banging on the apartment door and, frightened because of Venod's warning, hid in the drop ceiling in his apartment. *Id.* at 874–77.

Petitioner further testified that he had fired and re-hired Wright several times because Wright had kept for himself lost jewelry and money found at the Orealla. *Id.* at 883–84.

*Prosecution's Rebuttal Case*

Detective Ella Williams testified that when she interviewed Neith Rheingold and Michael Katwara on December 21, 1991, Rheingold did not tell her that he saw petitioner at the time of the shooting. *Id.* at 952–56.

Gerald Wright was recalled by the prosecution and testified that he had never been fired by the Shiwlochan family and he never kept any lost items that he found at the Orealla. *Id.* at 1013. Wright also testified that he had first seen petitioner with a .380 caliber pistol the summer prior to the shooting and could identify the gun from markings on the side of the weapon and because petitioner told him what kind of gun it was. *Id.* at 1013–14.

At the close of the evidence, the defense moved for a directed verdict of acquittal. *Id.* at 1019. The court dismissed the counts charging assault and reckless endangerment, but denied the motion as to the remaining counts. *Id.* at 1020.

*Request to Charge*

At the charge conference, defense counsel, Robert Blossner, requested that the court submit manslaughter charges to the jury as a lesser included offense of intentional murder on the theory that petitioner had acted under an extreme emotional disturbance. *Id.* at 1021–23. Counsel argued that the jury could disbelieve petitioner's testimony and still find, based on the prosecution's evidence, that petitioner "was so emotionally disturbed that there was no intent to murder." *Id.* at 1021. Blossner pointed to Wright's testimony that petitioner began shooting "immediately after" Wright was punched during a fist fight and that some of the Indian men harassed and propositioned petitioner's wife for sexual favors. *Id.* at 1022–23. The court granted the defense's request. *Id.*

*Summations*

Following the charge conference, there was a five day hiatus over Labor Day weekend before closing arguments. *Id.* at 1025–26. Highlighting the complete lack of physical evidence connecting petitioner to the shooting and attacking the reliability and credibility of the six eyewitnesses, defense counsel argued in summation that petitioner was a victim of misidentification. *Id.* at 1039–40, 1049–73. Counsel also suggested that Venod, rather than petitioner, was the shooter. *Id.* at 1059, 1087. Counsel did not argue or allude to the possibility that the defendant acted under an extreme emotional disturbance. However, the prosecution mentioned that some provocation "caused the defendant for whatever reason to pull out his weapon and commence firing." *Id.* at 1140–41.

*Jury Instructions*

Notwithstanding the trial court's agreement to instruct the jury on the defense of extreme emotional disturbance, the court did not do so. *Id.* at 1187–90. However, defense counsel did not object or otherwise remind the court that it had granted his request to instruct the jury on the affirmative defense.

*Sentence*

On September 9, 1992, the jury convicted petitioner of intentional murder, two counts of attempted murder and second degree weapon possession. *Id.* at 1214.

On September 30, 1992, Judge Leahy sentenced petitioner to the maximum possible sentence authorized by law: 41 2/3 years to life imprisonment. Sentencing Transcript ("S.") at 22–23.

*Direct Appeal*

Petitioner was represented by new counsel on direct appeal. Appellate counsel argued that the verdict was against the weight of the evidence because the affirmative defense of extreme emotional dis-

turbance was established by a preponderance of the evidence. Counsel also argued that the failure to issue the extreme emotional disturbance instruction denied petitioner a fair trial and asked the court to reach the issue in spite of "[t]he inadvertent but terribly serious failure by the court and defense counsel to catch this significant omission in timely fashion ..." Appellate counsel did not expressly argue that defendant had been denied his constitutional right to effective assistance of counsel.

On June 29, 1998, the Appellate Division rejected petitioner's first argument in "the exercise of [its] factual review power" and further found that the sentence imposed was not excessive. *People v. Shiwlochan,* 251 A.D.2d 687, 676 N.Y.S.2d 475 (2d Dep't 1998). On the second issue, the Appellate Division stated that "[t]he defendant's remaining contentions are unpreserved for appellate review or without merit." *Id.*

On December 2, 1998, the Court of Appeals denied defendant's application for leave to appeal. *People v. Shiwlochan,* 92 N.Y.2d 1038, 684 N.Y.S.2d 503, 707 N.E.2d 458 (1998).

*State Post Conviction Proceedings*

Petitioner moved to vacate the judgment pursuant to C.P.L. § 440 claiming that he was denied effective assistance of trial counsel in four respects: (1) counsel failed to discuss with defendant, investigate or present the defense of extreme emotional disturbance; (2) counsel failed to renew his request for an extreme emotional disturbance instruction at the end of the judge's jury charge, despite the trial court having already granted the request for the instruction; (3) counsel failed to request that the extreme emotional disturbance instruction be issued on the two counts of attempted murder; and (4) counsel failed to inform petitioner of a potential plea

offer prior to trial and the maximum punishment he would face if convicted.

In support of his motion to vacate, petitioner submitted affidavits from himself, his trial counsel, Robert Blossner, his wife, Maryann Nadia Shiwlochan, and his sister, Rohini "Mala" Shiwlochan. In his affidavit, Blossner declared that he never discussed the possibility of raising an EED defense with petitioner at any time because petitioner denied that he was the shooter. Blossner Affidavit ("Blossner Aff.") at ¶¶ 3, 6. Blossner further admitted he never "investigated" either the circumstances that existed on the night of the shooting or in petitioner's life that would have been relevant to such a defense. *Id.* However, Blossner claimed that during the trial, based on the prosecution's case "it did occur to me that the defense of Extreme Emotional Disturbance might be not only appropriate, but absolutely essential to explain [petitioner's] actions." *Id.* at ¶ 4. Despite having been granted the request for an EED instruction, Blossner admitted he simply "forgot" to pursue the defense in summation and object to the trial judge's failure to give the promised instruction. *Id.* at ¶ 5. He also acknowledged that "[t]here was no strategic reason why I did not pursue this alternative defense, nor any reason that I did not remind the judge to give the instruction, nor object to the instruction he did give." *Id.* Similarly, Blossner admitted that "it was simply an oversight" that he did not request a similar instruction as to the two counts of attempted murder. *Id.*

Blossner further averred that although the prosecution did not make a plea offer, Judge Leahy offered to impose a sentence of 15 years to life if petitioner pled guilty to the indictment. *Id.* at ¶ 6. Blossner did not convey Judge Leahy's offer to petitioner or give advice on the plea because he "felt that he had a viable defense based on mis-identification and because it never occurred to" him that someone with petitioner's background would receive such a severe sentence. *Id.*

In his affidavit, petitioner confirmed that Blossner never discussed the possibility of raising the extreme emotional disturbance defense nor did Blossner explain what evidence might be relevant to establish such a defense. Petitioner's Affidavit ("Pet.Aff.") at ¶ 3. Blossner also never asked petitioner about any factors that might have effected his mental state on the night of the shooting and petitioner never told him about these factors. *Id.* at ¶ 9. Petitioner declared that there were several factors that would have supported an EED defense, including extreme depression, a recent, unsuccessful attempt at suicide, financial problems, and prior exposure to violence. *Id.* at ¶¶ 4–8. Additionally, the day of the shooting was the second anniversary of his former girlfriend's brutal murder. *Id.* at ¶¶ 7–8.

Petitioner further alleged that "Blossner never urged me to consider entering a guilty plea and never advised me that I was facing as much time as I received." *Id.* at ¶ 10. He recalled that Blossner told him only that there was "no offer being made by the prosecution" and that, therefore, petitioner "might as well go to trial." *Id.* Petitioner added that had he known of the maximum penalty he was facing and of Judge Leahy's offer, "he most certainly would have agreed to plead guilty." *Id.*

In her affidavit, petitioner's wife, Maryann, reiterated her husband's claim that he was "under a lot of pressure emotionally and financially." M. Shiwlochan Affidavit ("M. Shiwlochan Aff.") at 1. Petitioner had begun "drinking alcohol regularly and was increasingly depressed." *Id.* In fact, shortly before the shooting, petitioner made a futile attempt at suicide. *Id.* Maryann also stated that on the night of the

shooting, a group of young Indian men approached her while she was working in the coatroom at the Orealla. *Id.* at 2. The men propositioned her with vulgar sexual comments and petitioner, who was only a few feet away, became "visibly upset." *Id.* As the men walked away, one of them appeared to bump purposefully into petitioner. *Id.*

Petitioner's sister, Rohini Shiwolochan, stated that there had been prior violent incidents at the Orealla. Rohini Shiwolochan Affidavit ("R. Shiwolochan Aff.") at ¶ 1. In particular, two or three years previously, someone pointed a gun at petitioner, leaving him "extremely shaken." *Id.* In addition, she confirmed that at the time of the shooting, the family business was delinquent on almost all of their bills and facing possible mortgage foreclosure. *Id.* at ¶ 2.

On May 26, 2000, the state court denied petitioner's motion to vacate the judgment without a hearing. *See* Appendix in Support of Petition ("Appx."), Exh. F. The court held that it was implicit in Blossner's affidavit that he chose to pursue petitioner's strongest possible complete defense, misidentification, rather than weaken that defense by pursuing another. *See id.* at 12. After having heard the prosecution's case, Blossner sought, as would any competent attorney, the EED instruction. *Id.* at 8–9. On the other hand, the court also found that Blossner's failure to object when the trial judge omitted the promised EED instruction "fell below the level of care required from attorneys." *Id.* at 8. However, after considering the affidavits submitted by petitioner and the trial evidence, the state court held that a jury would not be likely to find that petitioner acted under an extreme emotional disturbance. *Id.* at 10–11.

As to petitioner's claim regarding Blossner's failure to convey a plea offer, the court noted that Blossner's affidavit "merely acknowledges that he never 'urged' defendant to plead to the indictment." *Id.* at 11–12. Finding that Blossner's affidavit implicitly indicated "conveyance of the offer and advice concerning possible sentences," the court concluded petitioner was not deprived of "reasonably competent" counsel. *Id.* at 12.

On September 1, 2000, petitioner's request for leave to appeal was also denied. *See* Appx., Exh. A.

On July 11, 2000, petitioner filed a motion of *error coram nobis* claiming ineffective assistance of appellate counsel. Petitioner argued that counsel on appeal ineffectively characterized trial counsel's failure to object to the court's omission of the EED instruction as judicial error. Appellate counsel also failed to raise an ineffectiveness claim as to trial counsel's failure to request the EED instruction for the two attempted murder counts. On October 16, 2000, the *coram nobis* motion was denied. *People v. Shiwlochan,* 276 A.D.2d 651, 714 N.Y.S.2d 911 (2d Dep't 2000).

*Current Petition*

On September 8, 2000, petitioner filed the instant petition claiming he was denied effective assistance of counsel in three respects: 1) trial counsel failed to convey to him or advise him regarding a pre-trial plea offer; 2) trial counsel failed to consider, investigate and present the most viable defense to the charged offenses, extreme emotional disturbance; and 3) appellate counsel failed to raise the issue of ineffective assistance of trial counsel in failing to object when the trial court omitted the promised instruction on the EED defense. After reviewing the affidavits attached to

the petition,[2] this Court ordered that an evidentiary hearing be held on the first two claims raised by petitioner. *See* Calendar Order dated December 18, 2002.

*Habeas Hearing*

An evidentiary hearing was held on April 14–15, 2003.

Maryann Shiwlochan, petitioner's wife, described the circumstances surrounding her husband's life at the time of the shooting. She testified that relations between her and petitioner's family were strained for a variety of reasons, including the fact that she is of a different nationality, considerably younger than petitioner, and was pregnant with their son before they were married. Hearing Transcript ("Hearing Tr.") at 8. During fall of 1991, bill collectors were calling their home frequently. *Id.* at 9–10. Petitioner became increasingly depressed, losing sleep, drinking heavily and spending little time at home with his family. *Id.* at 8–10. Approximately one week before the shooting, she heard a loud noise in the apartment and found petitioner pointing a gun to his head.[3] *Id.* at 10–11. Despite fears about her husband's mental state, she did not discuss his condition with anyone or seek treatment for him. *Id.* at 12.

On the evening of December 20, 1991, while Mrs. Shiwlochan was working in the coatroom at the Orealla, a group of seven men approached her and, besides calling her a "bitch" and a "whore," told her "what they would do to [her] and how many of them would do it." *Id.* at 13–14. Petitioner was a few feet from the coatroom at the time and looked upset. *Id.* at 15–16. She also observed the men stealing drinks from patrons' tables and touching women in a sexual manner. *Id.* at 14.

Mrs. Shiwlochan testified that Blossner never interviewed her as to whether she saw the shooting nor asked her about the circumstances of her husband's life at the time of the shooting. *Id.* at 18. In fact, other than saying "hello," she had no conversations with Blossner. *Id.*

Petitioner testified that there had been violent incidents at the Orealla in the past. *Id.* at 48. In 1988, there was a fight between patrons that resulted in one person being killed. *Id.* A couple of months before December, 1991, someone pointed a gun at Gerald Wright. *Id.* at 50. A few weeks after that incident, someone wielded a gun on the dance floor. *Id.* at 50–51; Hearing Exh. 3.

At the time of the shooting, petitioner was overwhelmed with stress and depression because of financial troubles. Hearing Tr. at 70. In December, 1991, petitioner worked at the Orealla to support his wife, son and parents. *Id.* at 52. Petitioner's two sisters and his brother also depended on employment at the Orealla. *Id.* However, business at the Orealla was slow and getting worse. *Id.* at 52, 56. Among the club's financial problems, petitioner had not paid bills for gas, electricity, and insurance, and had received a foreclosure notice for non-payment of taxes. *Id.;* Hearing Exhs. 1A–1B, 2A–2H. Adding to petitioner's stress, December 21, 1991 was the second anniversary of the murder of his ex-girlfriend. Hearing Tr. at 57–58; Hearing Exh. 5. She had been dismembered and put in a box that was left out for garbage pick-up. Hearing Tr. at 57–58. Due to his state of mind, petitioner attempted suicide the night before the shooting. *Id.*

---

**2.** Annexed to the instant petition are the same affidavits submitted in support of petitioner's 440 motion.

**3.** The police did not respond to their apartment after the shot was fired nor did any neighbors inquire about the noise. *Id.* at 20.

Petitioner further testified that he was managing the Orealla on December 20, 1991. *Id.* at 45. That evening, seven or eight young men entered the Orealla wearing clothes that violated the club's dress code and were asked to remove the offending clothing. *Id.* at 59. Later, petitioner found the men smoking marijuana in the bathroom and told them to leave. *Id.* at 601. During the course of the evening, petitioner saw them groping women on the dance floor and heard the men cursing and harassing his wife. *Id.* at 61–62. Also, one of the men "intentionally" bumped petitioner as they were being escorted out of the club. *Id.* at 62.

While petitioner was clearing glasses from the bar, he heard loud banging and screaming in the vestibule. *Id.* at 63. Petitioner grabbed a gun that he kept in a secret compartment under the bar and ran to where he heard the noise.[4] *Id.* at 63–64. As he rushed to the vestibule, petitioner saw one security guard fighting with someone and yelled to Wright to open the door to get them out. *Id.* at 63. After one of the men punched Wright in the head, petitioner fired a shot out the door and over the heads of the people in the vestibule. *Id.* Chaos ensued as the crowd started pushing and shoving. *Id.* Petitioner testified, "I just lost it. I just keep firing. By the time the last shot was fired, I find I was out on the street." *Id.* He did not realize anyone was shot until he went back into the Orealla and saw two people bleeding. *Id.* He was "very, very scared because [he] didn't intend to shoot" anyone; he just wanted them out of the club. *Id.* at 63–64.

In the end of January, 1992, petitioner's family hired Blossner to replace his original counsel, Vineet Kohli. *Id.* at 66, 77. Petitioner told Blossner that he was not the shooter. *Id.* at 66, 74. Blossner never discussed the EED defense with petitioner, nor did Blossner ever tell petitioner that he might be found guilty of a lesser charge than murder or attempted murder, even if he had shot people. *Id.* at 66–67. Blossner never asked whether petitioner was encountering any particularly stressful circumstances at the time of the incident, *id.* at 67, nor did petitioner volunteer information about the financial pressures he was under, the prior violent incidents at the Orealla, or the circumstances of his ex-girlfriend's death. *Id.* at 80. At trial, petitioner was not aware of the EED defense. *Id.* at 66.

During the representation, petitioner had asked Blossner if there was a plea offer in the case, but Blossner responded that the prosecution had not made an offer. *Id.* at 66. Blossner never raised the possibility of pleading guilty nor did he tell petitioner that there was any kind of offer being made. *Id.* at 69. Further, neither Blossner nor petitioner's original counsel, Vineet Kohli, told petitioner the maximum sentence he was facing if convicted of all the charges. Nor did they tell him that he could be sentenced to multiple prison terms to be served consecutively.[5] *Id.* at 69, 76–77. Petitioner believed twenty-five years was the maximum sentence he faced based on other sentences he had read about in the news. *Id.* at 75–76. Petitioner testified that if he had known that he could have pled guilty and received a sen-

---

**4.** Petitioner claimed he obtained the gun in November, 1991 while visiting a friend in Florida. *Id.* at 64. Petitioner had applied for a gun permit in December, but the gun was unregistered at the time of the shooting. *Id.*

**5.** Petitioner testified that Kohli was hired for the purpose of obtaining a plea offer from the prosecution. *Id.* at 77. Petitioner replaced Kohli as counsel because Kohli was unable to secure a plea offer and told petitioner that he needed a better trial attorney. *Id.*

tence of 15 years to life, he "definitely" would have accepted the offer and still would now. *Id.*

Petitioner acknowledged that he lied at his trial because he was scared and did not want to go to prison for the rest of his life. *Id.* at 67–68. As petitioner did not believe that he could get a sentence less than the maximum without going to trial and Blossner told him there was no plea offer, petitioner thought he had no other options. *Id.* at 67–68, 74.

Blossner testified that when petitioner's family retained him, petitioner maintained his innocence. *Id.* at 129. Blossner was aware that petitioner had no criminal record, *id.*, and Blossner had learned through his own investigation that the victims, and the witnesses who were with them, were gang members with histories of violent crimes. *Id.* at 130, 132.

The prosecutor's theory of the case was that the petitioner fired on the victims because the group had made lewd comments to his wife. *Id.* Blossner testified that during the relevant time period, he was aware of and understood the EED defense. *Id.* at 130–31. However, Blossner did not tell petitioner of the existence of the defense nor "what was involved" in such a defense. *Id.* at 131, 171. Although Blossner ordered an investigation into the backgrounds of the victims and their friends, he neither investigated the circumstances surrounding petitioner's life nor discussed with petitioner or his wife any factors that might have caused him stress. *Id.* at 132, 148, 170. Blossner was not aware of any financial pressure petitioner was under, petitioner's depression or the circumstances regarding the murder of petitioner's ex-girlfriend. *Id.* at 133.

Based on his limited view of the facts and circumstances of the case, Blossner believed that misidentification was the best defense available. *Id.* at 157. In fact,

Blossner testified, "[t]he defendant said he didn't do it". How can I have an EED defense if the defendant says 'I didn't do it.' *Id.* at 159–60. Blossner further explained he chose not to discuss the EED defense with petitioner because Blossner did not want to "beat him up" and damage petitioner's ability to testify as to his claimed innocence. *Id.* at 166, 170–71.

Blossner explained that he ultimately requested a jury charge on the EED defense because the prosecution's case itself established an EED defense. *Id.* at 134. However, Blossner did not attempt to offer proof in support of that defense, *id.* at 134–35, and unintentionally failed to argue the defense in summation. *Id.* at 135–36. Moreover, Blossner did not realize that the judge failed to instruct the jury on the EED defense because he "just missed it" and there is "no excuse for that at all." *Id.* at 136–37.

Blossner further testified that the trial judge offered to sentence petitioner to the minimum term of fifteen years to life in exchange for petitioner pleading guilty to murder. *Id.* at 137, 142. To the best of Blossner's recollection, the judge made the offer in his robing room during jury selection. *Id.* at 142. Although Blossner did not recall seeing any notes in his file indicating that the judge had made an offer, Blossner was certain that he was not mistaken as to his recollection of the offer. *Id.* at 151, 168.

Blossner admitted he never conveyed that offer to petitioner nor did he ever discuss any other plea offer with petitioner. *Id.* at 137, 140. Blossner explained that he did not convey the trial judge's offer because petitioner claimed innocence from the beginning of their relationship. *Id.* at 138–39. In fact, petitioner had vehemently denied committing the crime and had always indicated that he wanted to go

to trial. *Id.* at 143, 145. Blossner "never thought that he would take a plea in this case." *Id.* at 145. Moreover, Blossner never anticipated that petitioner would be sentenced to such a long prison term. *Id.* at 138–39. Although Blossner was aware of the maximum sentence petitioner faced if sentenced to the maximum penalty on each charge to run consecutively, he "may have told [petitioner] that he was facing twenty-five [years] to life" and does not "believe he told [petitioner] the maximum that he was facing." *Id.* at 138. Based on his experience, the prosecution's case and petitioner's lack of a criminal history, Blossner believed that the likely sentence petitioner faced was 25 years to life. *Id.* at 138–39. Blossner was shocked by the sentence petitioner actually received. *Id.* at 139, 141.

Barry Kamins, qualified as an expert on state criminal practice, testified that in New York state criminal proceedings, a defendant typically pleads guilty at arraignment but may change his plea to guilty up to and during jury deliberations. *Id.* at 196. Judges are frequently involved in disposing cases at all stages of the proceedings. *Id.* at 206. Since defendants have the right to plead under CPL § 220 to the indictment without the consent of the prosecution, it is a common practice for judges to promise a sentence in exchange for a guilty plea to the indictment. *Id.* at 198. If a defendant wants to plead guilty to the entire indictment, the judge cannot reject the plea. *Id.* at 201. Also, if a defendant accepts the prosecutor's offer to plead to a charge other than the top count of an indictment, the court must approve the plea. *Id.* at 198.

Respondent called Vineet Kohli, a patent attorney, who represented petitioner for a short time in connection with the shooting in January, 1991. *Id.* at 211, 213. Kohli testified he explained the top count of the indictment and the maximum and minimum sentence on that count to petitioner. *Id.* at 213–14. Kohli explained that the minimum sentence for second degree murder was fifteen years to life, the maximum was twenty-five years to life, and given that "this was Queens County," it was possible petitioner could receive consecutive sentences. *Id.* at 214.

Peter Dunne, who served as the principal law clerk to Judge John Leahy from August, 1986 to December, 1996, also testified on behalf of respondent. *Id.* at 236. His duties as law clerk included conferencing and negotiating dispositions in all cases pending before Judge Leahy, writing all of the judge's decisions and drafting jury instructions. *Id.* at 237. Dunne testified that Judge Leahy became involved with disposing of a case only after Dunne reached an agreement with the parties. *Id.* He also claimed that while Judge Leahy ordinarily did not offer a particular sentence to a defendant, the judge had a "policy not to take any disposition once jury selection began." *Id.* at 238.

Although Dunne had no recollection of the facts of petitioner's case, he testified he made it a habit to be with the judge during trials because "Judge Leahy needed watching. I needed to make sure that everything he did was right." *Id.* at 243.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

I. *Appropriateness of Habeas Hearing*

 Respondent argues that the habeas hearing should not have been held. Hearing Tr. at 2–3; Respondent's Opposition to Petition ("Resp.Opp.") at 39. However, "in habeas cases, the district court is not limited to the state court record, and has discretion to conduct an evidentiary hearing." *Jones v. Vacco,* 126 F.3d 408, 417 n.

2 (2d Cir.1997); *see Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963), *partially overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Nieblas v. Smith*, 204 F.3d 29, 31 (2d Cir.1999) ("A district court has broad discretion to hear further evidence in habeas cases"); *Pagan v. Keane*, 984 F.2d 61, 63–65 (2d Cir.1993). Among the factors relevant to the district court's determination are the existence of a factual dispute, the strength of the proffered evidence, the thoroughness of prior proceedings and the nature of the state court determination. *Pagan*, 984 F.2d at 64. "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (citations and internal quotation marks omitted).

 A petitioner who "failed to develop the factual basis of a claim in State Court proceedings" is ordinarily barred from seeking an evidentiary hearing in federal court. *See* 28 U.S.C. § 2254(e)(2). However, "a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission." *Drake*, 321 F.3d at 347. "Where, as here, a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, § 2254(e)(2) does not apply." *Id.* (citation and internal quotation marks omitted).

The state court disposed of petitioner's claims without holding any evidentiary hearing. However, the court inexplicably concluded from Blossner's affidavit that Blossner had, in fact, conveyed Judge Leahy's plea offer to petitioner, despite Blossner's clear statement to the contrary. The trial court also declined to develop the record on the claim that Blossner did not pursue the extreme emotional disturbance defense, even though the court acknowledged that Blossner's failure to do so amounted to ineffective assistance of counsel. This Court thus exercised discretion to hold an evidentiary hearing and elucidate the facts described in the affidavits submitted. *See Williams v. Taylor*, 529 U.S. 420, 441–42, 120 S.Ct. 1479, 1493, 146 L.Ed.2d 435 (2000) (holding that because petitioner diligently pursued claims in state court, and was denied a hearing, he was entitled to a hearing in federal court); *Belmontes v. Woodford*, 335 F.3d 1024, 1054 (9th Cir.2003) (petitioner who "allege[s] facts which, if proven, would entitle him to relief and show that he did not receive a full and fair hearing in a state court" must receive a hearing in federal court), *amended by* 350 F.3d 861, 2003 WL 22770084 (9th Cir. Nov.20, 2003); *Drake*, 321 F.3d at 345–46 (remanding to district court for discovery and hearing, if district court in its discretion considers that a hearing is needed, where state courts did not permit development of factual record); *see also United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C.Cir.1997) (in remanding for evidentiary hearing, noting that "ineffective assistance of counsel claims usually require an evidentiary hearing").

## II. *Applicable Law for Habeas Review*

The writ of habeas corpus is available to any person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Since this petition was filed after AEDPA's enactment, the provisions of AEDPA govern to the extent applicable. *See Williams*, 529 U.S. at 402–03, 120 S.Ct.

1495; *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir.2001).

AEDPA created a new standard of review intended to "place[] a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams*, 529 U.S. at 399, 120 S.Ct. 1495. A court reviewing a habeas petition under AEDPA may not grant a writ "with respect to any claim that was adjudicated on the merits in State court proceedings unless" the state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■■■ The two clauses of subsection (1) have "independent meaning." *Williams*, 529 U.S. at 364, 120 S.Ct. 1495. Under the first clause, a state court decision will be considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. Under the second clause, habeas relief may be granted if the state court decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495. "An unreasonable application of federal law is more than an incorrect application, but the petitioner need not show that all reasonable jurists would agree that a state court determination is incorrect in order for it to be unreasonable." *Yung v. Walker*, 341 F.3d 104, 109–10 (2d Cir. 2003). Whether a state decision is an "un-

reasonable application" of federal law must be based on an objective standard and relief may not be granted unless a relevant state court decision is both erroneous and unreasonable. *Id.* at 110.

As the Second Circuit has clarified, a state court need not set forth the legal basis for resolution of federal claims in order for the broadly deferential standard set out in AEDPA to apply. *See Sellan v. Kuhlman*, 261 F.3d 303, 311–12 (2d Cir. 2001). Rather:

> [T]he plain meaning of § 2254(d)(1) dictates [that for] the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

*Sellan*, 261 F.3d at 312.

■■■ In reviewing findings of fact under AEDPA, federal courts must assess whether the state court's determination was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under this standard, a state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). However, this presumption is not required when "the material facts were not adequately developed at the State court hearing." *Morris v. Reynolds*, 264 F.3d 38, 47 (2d Cir.2001), *cert. denied*, 536 U.S. 915, 122 S.Ct. 2381, 153 L.Ed.2d 199 (2002); *Smith v. Mann*, 173

F.3d 73, 76 (2d Cir.1999); *Pagan,* 984 F.2d at 64. Where, as here, the state court conducted no fact-finding hearing whatsoever, the presumption of correctness does not apply.[6] *See Morris,* 264 F.3d at 47; *Smith,* 173 F.3d at 76; *Porter v. Gramley,* 112 F.3d 1308, 1317 (7th Cir.1997) ("we cannot blindly apply the presumption of correctness to this finding because ... the trial court never conducted an adequate hearing").

### III. *Ineffective Assistance of Trial Counsel*

In order to prevail on a claim of ineffective assistance of trial counsel, a petitioner must demonstrate that his attorney's representation (1) "fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994); *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992); *Abdurrahman v. Henderson,* 897 F.2d 71, 74 (2d Cir.1990).

A court reviewing an attorney's performance must be "highly deferential" and must make "every effort [ ] to eliminate the distorting effects of hindsight," evaluating "the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 669, 104 S.Ct. 2052; *see also Loliscio v. Goord,* 263 F.3d 178, 192 (2d Cir.2001). Thus, a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.1996). That

presumption is intended to protect lawyers from having strategic decisions judged with "the distorting effects of hindsight." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "Prevailing norms of practice as reflected in American Bar Association standards" provide guides as to what constitutes objective reasonableness. *Id.* at 688, 104 S.Ct. 2052.

 "The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact." *United States v. Couto,* 311 F.3d 179, 187 (2d Cir.2002). Under AEDPA, mixed questions of law and fact are subject to the standard set forth in 28 U.S.C. § 2254(d)(1) which requires the habeas court to determine whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Overton v. Newton,* 295 F.3d 270, 277 (2d Cir.2002); 28 U.S.C. § 2254(d)(1).

#### A. *Plea Offer*

The Supreme Court has expressly extended the application of the *Strickland* standards to ineffective assistance claims arising out of the plea process. *See Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). "The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case ... [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision." *Gordon,* 156 F.3d at 380; *Boria v. Keane,* 99 F.3d 492, 497 (2d Cir.1996) (quoting Anthony G. Amsterdam,

---

**6.** Alternatively, as discussed below, I find that petitioner has rebutted the presumption of

correctness by clear and convincing evidence.

Trial Manual 5 for the Defense of Criminal Cases (1988)). The New York Model Code of Professional Responsibility, EC 7–7 (2002) instructs that a criminal defense lawyer "has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable." In contrast to other claims of ineffective assistance of counsel where counsel's conduct may implicate strategic decisions, counsel is absolutely obligated to convey both the fact and terms of the plea offer and provide some advice regarding this "crucial decision." *See Boria*, 99 F.3d at 498; *see also Cullen v. United States*, 194 F.3d 401, 404 (2d Cir.1999).

Indeed, counsel is constitutionally required to give a defendant some advice regarding a plea offer, such as informing the defendant of the strengths and weaknesses of the prosecution's case. *Pham v. United States*, 317 F.3d 178, 182–83 (2d Cir.2003); *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir.2000); *Cullen*, 194 F.3d at 404 ("counsel *must always* " convey the terms of a plea offer to the defendant) (emphasis added); *Boria*, 99 F.3d at 498; *see Von Moltke v. Gillies*, 332 U.S. 708, 721, 68 S.Ct. 316, 92 L.Ed. 309 (1948) ("[A]n accused is entitled to rely upon his counsel . . . to offer his informed opinion as to what plea should be entered"). Counsel must also advise the defendant on the maximum sentencing exposure if he stands trial as opposed to accepting a plea offer. *See United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998) ("[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.").

■ The 440 court's factual finding that petitioner's counsel's affidavit implied that he conveyed the trial judge's plea offer and rendered advice as to possible sentences is an unreasonable determination of the facts in light of evidence presented in the state court proceeding. By affidavit submitted to the 440 court, Blossner stated that "[t]he only thing I told Mr. Shiwlochan [regarding the judge's plea offer] was that there was no offer in the case." Ignoring that sentence, the 440 court focused on counsel's next sentence that counsel "never 'urged' defendant to plead to the indictment" to infer that Blossner did convey the plea offer. The 440 court's determination of the facts was unreasonable and clearly contradicted by Blossner's affidavit before that court. Blossner's testimony, which I found credible, dispels any possible doubt that the 440 court clearly misread Blossner's affidavit. *See* Hearing Tr. at 139–140. Blossner testified that Judge Leahy had offered to sentence petitioner to the minimum term of imprisonment if he pled guilty to the murder count.[7] Blossner neither conveyed that plea offer nor ever discussed the possibility of a plea offer with petitioner. Hearing Tr. at 151, 168.

■ That the trial judge extended the plea offer rather than the prosecutor makes no difference. In New York, trial judges are involved in disposing cases at all stages of the proceeding and it is common practice for trial judges to promise a particular sentence in exchange for a guilty plea to the indictment. *Id.* at 198, 206. In fact, a defendant has a statutory right to plead to the indictment without the consent of the prosecution. *Id.;* N.Y.

7. I found Blossner's testimony credible, notwithstanding Mr. Dunne's remarkable testimony regarding Judge Leahy and the judge's policy not to accept a plea after commencement of jury selection. As Mr. Dunne admitted, he was not in the courtroom at all times and, despite his avowed watchfulness, apparently did not remind Judge Leahy to include an instruction on the extreme emotional disturbance defense in the jury charge.

C.P.L. § 220. The ultimate decision as to what plea to enter is reserved for the defendant regardless of whether there is any plea offer or the source of a plea offer. *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions," including "whether to plead guilty"); *Hill*, 474 U.S. at 56, 106 S.Ct. 366 (defendant retains the right to make reasonably informed decision to accept or reject a plea offer); *Purdy*, 208 F.3d at 45; Model Rules of Professional Conduct Rule 1.2(a) (2002) ("[T]he lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered"); ABA Model Criminal Justice Standards, 4–5.2 (1993) (decision of "what pleas to enter" and "whether to accept a plea agreement" are to be made by accused); N.Y. Model Code of Prof. Responsibility EC 7–7 (2003) ("it is for the client to decide what plea should be entered"). Thus, an attorney is obligated to convey to his client any plea offer, including a plea offer from the trial judge, to enable the client to make a reasoned decision as to what plea to enter. *Id.*; Hearing Tr. at 199, 205.

Under these facts, petitioner's counsel provided assistance that fell below an objective standard of reasonableness by failing to convey the existence of a plea offer extended by the trial judge and rendering advice on the terms. As the Second Circuit held in *Boria*, "there can be no doubt that counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution." 194 F.3d at 404; *see Pham*, 317 F.3d at 182; *Purdy*, 208 F.3d at 45; *Cullen*, 194 F.3d at 404.

Obviously, having not been informed of the fact of a plea offer, petitioner received no advice whatsoever on the wisdom of accepting the plea. *See Pham*, 317 F.3d at 182 ("Defense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government"); *Purdy*, 208 F.3d at 44–45; *Boria*, 99 F.3d at 496.

Further, I find that Blossner testified credibly that he never fully discussed with petitioner the maximum imprisonment petitioner faced at sentencing if convicted at trial due to Blossner's belief that petitioner would not be so sentenced. Hearing Tr. at 138–39, 141. Such underestimation of his client's maximum potential sentence was ineffective assistance of counsel.[8] *See Gordon*, 156 F.3d at 380. Accordingly, the 440 court's finding that Blossner rendered "reasonably competent" representation by providing "advice concerning possible sentences" is an unreasonable application of law. By underestimating petitioner's exposure, Blossner breached his duty "to advise his client fully on whether a particular plea to a charge appears desirable." *Gordon*, 156 F.3d at 380; Model Code of Professional Responsibility EC 7–7 (1992). Indeed, Blossner admitted in his affidavit: "it never occurred to me that this hard working businessman, with a heretofore exemplary, spotless record, would receive a sentence which far exceeded the mandatory minimum." Blossner Aff. at ¶ 6. Merely advising petitioner as to possible sentences rather than advising him on his full sentencing exposure is insufficient. *Gordon*,

---

8. Although Kohli testified that he advised petitioner of the maximum sentences that could be imposed, Kohli represented petitioner for a very short period of time before being replaced. Hearing Tr. at 221. Given Kohli's acknowledged limited experience with murder cases and the short duration of representation, *id.* at 211, 219–220, Kohli's advice is not sufficient under the circumstances to rectify Blossner's subsequent hazy underestimate of petitioner's potential sentence.

156 F.3d at 380. Failure to advise a client of his maximum exposure to imprisonment falls below an objective standard of reasonableness as measured by prevailing professional norms. *See Cullen,* 194 F.3d at 404; *Gordon,* 156 F.3d at 380; *Gaviria,* 116 F.3d at 1512.

In short, petitioner's counsel failed to "render the most basic advice" to his client in failing to convey the terms of a plea offer and give an accurate comparison of the maximum sentencing petitioner would have faced upon a guilty plea and after a trial. *Cullen,* 194 F.3d at 404; *see Purdy,* 208 F.3d at 48.

In analogous circumstances, the Second Circuit has held that similar testimony by trial counsel was sufficient to establish ineffective assistance of counsel. For example, in *Boria,* petitioner's counsel testified that he never discussed the advisability of accepting or rejecting a plea offer with his client. *Boria,* 99 F.3d at 495. There, counsel's "unequivocal testimony ... established beyond peradventure" that counsel never provided his client with constitutionally required advice. *Id.* at 497–98. Similarly, in *Cullen,* the Second Circuit relied on petitioner's counsel's testimony that he failed to inform his client of the terms of a plea offer in finding counsel ineffective. 194 F.3d at 404; *see also Gordon,* 156 F.3d at 377 (petitioner submitted letter from trial counsel confirming counsel's underestimate of client's sentencing exposure). Indeed, petitioner's counsel's testimony is entitled to great weight because an admission by defense counsel that he provided ineffective assistance is against his personal and professional interests. *See, e.g., Paters v. United States,* 159 F.3d 1043, 1056–58 (7th Cir.1998) (Coffey, J., dissenting and concurring) ("Charges of attorney incompetence are far from a trivial matter for legal counsel. ... [A] published finding of incom-petence is obviously harmful to a legal career"); *United States v. Day,* 969 F.2d 39, 46 n. 9 (3d Cir.1992) (recognizing that "incompetent lawyers risk disciplinary action, malpractice suits, and consequent loss of business"); *Alvernaz v. Ratelle,* 831 F.Supp. 790, 794 (S.D.Cal.1993) (Petitioner's counsel's "statements are entitled to heightened credibility because the very statements that are beneficial to petitioner are harmful to [counsel's] own professional reputation").

Respondent argues that because petitioner maintained his innocence, petitioner's counsel's failure to convey the judge's plea offer was reasonable under the circumstances. Resp. Opp. at 23. In *Cullen,* the Second Circuit squarely rejected a similar argument. At the habeas hearing, Cullen's attorney testified that he neither conveyed nor discussed the terms of a plea offer with his client because Cullen "had adamantly professed his innocence and had never indicated any willingness to plead guilty and because [counsel] believed that Cullen was innocent." 194 F.3d at 402. Despite Cullen's claim of innocence, the Court concluded that counsel was "plainly deficient" and "must always communicate to the defendant the terms of any plea bargain." *Id.* at 404. Similarly, in *Boria,* the Second Circuit examined "a criminal defense lawyer's duty when a defendant's best interests clearly require that a proffered plea bargain be accepted, but the defendant, professing innocence, refuses to consider the matter." 99 F.3d at 496. In deciding that counsel must give his client some advice on the wisdom of accepting a plea offer, the Court opined that "such duty is so well understood by lawyers practicing in this Circuit that the question has never been litigated." *Id.* at 496–97. Thus, Blossner violated his duty to communicate the terms of a plea offer and advise the defendant on accepting a plea

even in the face of his protestations of innocence.

Respondent further argues that petitioner has failed to identify "clearly established" Supreme Court precedent dictating the result he seeks. Resp. Opp. at 24–25. However, petitioner's claim is governed by the same constitutional principles under which the facts of *Gordon* were tested— the two prong analysis of ineffective assistance of counsel established by *Strickland. See Williams*, 529 U.S. at 391, 120 S.Ct. 1495; *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir.2001) ("In a petition for habeas relief alleging ineffective counsel, the question as to whether the matter is governed by existing Supreme Court precedent 'is easily answered because the merits of [such] claim[s] are squarely governed by [the Supreme Court's] holding in *Strickland v. Washington* ' "); *Sacco v. Cooksey*, 214 F.3d 270, 273–74 (2d Cir.2000) (ineffective assistance of counsel claim "seeks to apply a rule of law that was clearly established at the time [petitioner's] state-court conviction became final because the merits of his claim are squarely governed by the Supreme Court's holding in *Strickland* "). While Second Circuit decisions are illustrative of a logical application of Supreme Court precedent articulated in *Strickland*, it is *Strickland* itself that petitioner relies on as the basis for his petition. Although AEDPA looks to Supreme Court precedent in its reference to "clearly established federal law," *see* 28 U.S.C. § 2254(d)(1), federal habeas courts are not precluded from considering the decisions of inferior federal courts, as "helpful amplifications of Supreme Court precedent," in "evaluating whether the state court's application of the law was reasonable." *Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir.1999) (en banc); *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir.1998) [9] ("To the extent that

inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue"), *cert. denied*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999); *see also Durant v. Strack*, 151 F.Supp.2d 226, 239 n. 8 (E.D.N.Y.2001). Accordingly, petitioner properly relies on *Strickland* as "clearly established Federal law, as determined by the Supreme Court" applicable to the instant claim.

Petitioner also satisfies *Strickland's* prejudice prong. "Generally, a defendant suffers prejudice if there is a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings." *Pham*, 317 F.3d at 182; *Lindstadt*, 239 F.3d at 204 ("The level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case' "). The *Strickland* Court defined "reasonable probability" as one that "undermine[s] confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Petitioner testified that he specifically asked his attorney if there was a plea offer and that he would have accepted the judge's plea offer had it been conveyed to him. Hearing Tr. at 66, 75–76. While I did not find petitioner's other testimony completely believable, his testimony regarding the plea offer is credible given the maximum sentence he faced and, in fact, received after trial. Moreover, Blossner admitted that he most likely advised petitioner that he faced a maximum sentence of 25 years to life. Hearing Tr. at 139. In this case, there is a vast difference between petitioner's actual sentencing exposure, 41 2/3 years to life, and the sentence

9. *Overruled on other grounds by McCambridge* *v. Hall*, 303 F.3d 24 (1st Cir.2002).

he would have faced if he had pled guilty, 15 years to life. Thus, I find the large sentencing disparity coupled with petitioner's statements sufficient to establish "a reasonable probability" that petitioner would have accepted the plea offer had counsel conveyed it to him. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

In similar circumstances, the Second Circuit has found prejudice where the petitioner stated that he would have accepted the unconveyed plea offer which was significantly lower than the actual sentence. *Pham,* 317 F.3d at 182 (sentencing disparity of at least 113 months and petitioner's statement that he would have accepted plea offer is sufficient to support prejudice finding); *Mask v. McGinnis,* 233 F.3d 132, 141–42 (2d Cir.2000) (large disparity in sentencing exposure coupled with petitioner's statement that he would have accepted reasonable plea offer satisfies prejudice requirement); *Gordon,* 156 F.3d at 381 (same); *see also Cullen,* 194 F.3d at 407–08 (stating that disparity between actual sentence and sentence available through plea bargain is a factor in determining whether petitioner suffered prejudice).

■ Respondent argues that petitioner's claimed innocence both before and during trial precludes a finding of prejudice. On the contrary, the Second Circuit has held that a petitioner's insistence on his innocence is not dispositive. *See Cullen,* 194 F.3d at 407. Significantly, in *Cullen,* the Court recognized that had the petitioner been informed of the disparity between his likely sentence after trial and under the plea offer, he "might well have abandoned his claim of innocence." *Id.; see also Mask,* 233 F.3d at 142 (petitioner's "protestations of innocence do not forestall a conclusion that he would have been amenable to a reasonable plea offer"); *Gordon,* 156 F.3d at 381 (finding prejudice based on sentencing disparity and petitioner's state-

ment despite petitioner's professing innocence at trial); *Boria,* 99 F.3d at 497–98 (had counsel provided his client with constitutionally required advice there would have been more than a reasonable probability petitioner would not have pursued "the suicidal course he seemed bent upon following"). More recently, the Second Circuit expressly acknowledged that where the disparity in potential sentences is large, as here, the fact finder may infer that a defendant who professes innocence would still consider a plea. *Pham,* 317 F.3d at 183. In the instant case, petitioner testified that had he known of the actual maximum penalty he faced if convicted and the trial court's plea offer, he would have abandoned his claim of innocence and accepted the offer. Hearing Tr. at 75–77. Given the vast disparity between the plea offer and the maximum imprisonment petitioner faced, I find his testimony on this point credible.

■ Since petitioner has established his first claim that he was deprived of effective assistance of counsel with respect to Blossner's failure to convey a plea offer, the question remains what the appropriate relief should be. Petitioner argues that the appropriate remedy is specific performance of the plea offer in the form of a sentence reduction. "[A] finding of ineffective assistance requires a remedy specifically tailored to the constitutional error. That remedy is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir.2000); *see Gordon,* 156 F.3d at 381 ("[W]here there has been a finding of ineffective assistance of counsel in a § 2255 proceeding, the remedy 'should be tailored to the injury suffered from the constitutional violation ...' "); *cf. United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct.

665, 66 L.Ed.2d 564 (1981) ("Our approach has ... been to identify and then neutralize the [constitutional defect] by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel ..."). Although specific performance of a plea offer is not always the appropriate remedy, see *Carmichael*, 216 F.3d at 227; *Gordon*, 156 F.3d at 381, granting a re-trial would be impractical due to the significant lapse of time since petitioner's trial. See *Boria*, 99 F.3d at 499 (noting the potential for lost witnesses and faded memories). Under the circumstances, the only remedy to make petitioner whole would be resentencing according to the terms petitioner would have received had he been informed of and accepted the plea offer. See *Carmichael*, 216 F.3d at 227 (appropriate remedy is resentencing according to the terms petitioner would have received had he been given proper legal advice); *Boria*, 99 F.3d at 499 (reducing petitioner's sentence to time served in accordance with spurned plea offer); cf. *Mask v. McGinnis*, 28 F.Supp.2d 122, 126 (S.D.N.Y.1998) (conditionally granting petition unless respondent agrees to reduce petitioner's sentence or grant him a new trial), *aff'd*, 233 F.3d 132 (2d Cir.2000). Therefore, I recommend that petitioner's sentence be reduced to 15 years in accordance with Judge Leahy's plea offer.

### B. *EED Defense*

Petitioner claims that he was denied effective representation due to counsel's failure to pursue a potential EED defense. Specifically, petitioner argues that counsel failed to advise petitioner of the availability of the defense either before, or during trial. Counsel simply failed to conduct any investigation to determine whether circumstances existed to support an EED defense. Although counsel requested a jury instruction on the defense at trial, he failed to argue it in summation and failed to object when the court omitted the promised instruction.

██ Petitioner is not entitled to relief on this claim because he fails to satisfy the prejudice prong of *Strickland*. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed"); *Brown v. Artuz*, 124 F.3d 73, 80 (2d Cir.1997) (need not reach question of deficient performance because petitioner could not satisfy prejudice prong); *United States v. O'Neil*, 118 F.3d 65, 72–73 (2d Cir.1997). In fact, the 440 court found that although counsel's errors amounted to inadequate representation, petitioner failed to show a reasonable probability that the outcome of the trial would have been different. The court held that the evidence adduced at trial, coupled with the additional evidence submitted by petitioner, "fail[ed] to raise a substantial question as to whether a jury would have been persuaded by a preponderance of evidence both that defendant was influenced by an extreme emotional disturbance on the night of the crimes and that there was a reasonable explanation or excuse for the disturbance." See Appx., Exh. F at 10. Specifically, the 440 court found that "[n]either the actions of the young men at the club on the night in question nor the prior incidents of violence attested to by defendant and his sister, were, alone or together, sufficient to generate the extreme and immediate fear which might reasonably excuse a loss of control. Nor can financial pressures and depression be said to be reasonable excuses." *Id.* at 10–11. The state court's determination is not an unreasonable application of federal law.

██ Under New York law, extreme emotional disturbance is a partial affirma-

tive defense to murder in the second degree. *See* N.Y. Penal Law § 125.25(1)(a). To avail himself of the defense, a defendant must prove by a preponderance of the evidence that he acted "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.; see People v. Roche*, 98 N.Y.2d 70, 75, 745 N.Y.S.2d 775, 779–780, 772 N.E.2d 1133 (2002); *People v. White*, 79 N.Y.2d 900, 903, 581 N.Y.S.2d 651, 590 N.E.2d 236 (1992). "The defense allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although [ ] not free from responsibility for [the] crime, [defendant] ought to be punished less severely." *Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d 775, 772 N.E.2d 1133 (internal citations omitted).

 The elements required to establish a successful EED defense are: 1) that there was an objectively reasonable explanation or excuse for the emotional disturbance; and 2) that the defendant's conduct was influenced by an extreme emotional disturbance at the time the crime was committed. *DeLuca*, 77 F.3d at 589; *see Roche*, 98 N.Y.2d at 76, 745 N.Y.S.2d 775, 772 N.E.2d 1133; *White*, 79 N.Y.2d at 903, 581 N.Y.S.2d 651, 590 N.E.2d 236. The first element requires proof that defendant's emotional disturbance was supported by a reasonable explanation or excuse. *Roche*, 98 N.Y.2d at 76, 745 N.Y.S.2d 775, 772 N.E.2d 1133; *White*, 79 N.Y.2d at 903, 581 N.Y.S.2d 651, 590 N.E.2d 236. The second element is subjective and requires proof that defendant's conduct was actually influenced by an extreme emotional disturbance at the time the alleged crime was committed. *Roche*, 98 N.Y.2d at 76, 745 N.Y.S.2d 775, 772 N.E.2d 1133; *White*, 79 N.Y.2d at 903, 581 N.Y.S.2d 651, 590 N.E.2d 236. A de-

fendant must present evidence that he "suffered from a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control." *Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d 775, 772 N.E.2d 1133. However, "not all mental infirmities merit a manslaughter charge based on extreme emotional disturbance." *Id.*

To establish an EED defense, a defendant's reaction must be "an understandable human response deserving of mercy." *People v. Casassa*, 49 N.Y.2d 668, 680–81, 427 N.Y.S.2d 769, 776, 404 N.E.2d 1310 (1980). For example, a defendant who witnessed his estranged wife engaged in sexual activity with another man did not have a sufficient ground for an EED defense. *See People v. Berk*, 217 A.D.2d 941, 943, 629 N.Y.S.2d 588, 590 (4th Dep't 1995). Similarly, a defendant who was previously menaced by the victim was held not to have acted under the influence of an extreme emotional disturbance. *People v. Mejia*, 166 A.D.2d 675, 561 N.Y.S.2d 265 (2d Dep't 1990); *compare DeLuca*, 77 F.3d 578. Likewise, a defendant with a protracted history of disputes with two victims did not act under an extreme emotional disturbance when he shot both of them. *People v. Hayes*, 223 A.D.2d 602, 636 N.Y.S.2d 409 (2d Dep't 1996).

Petitioner testified that there were several factors affecting him on the day of the shooting. There had been two violent incidents at the Orealla within a few months of the shooting as well as an incident at least three years before the shooting. Additionally, petitioner testified that he was overwhelmed with stress and depression due to financial troubles and the anniversary of his ex-girlfriend's brutal death.

On the night of the shooting, petitioner testified that he saw the victims and their friends groping women on the dance floor and heard the men cursing and harassing

his wife. Hearing Tr. at 61–62. Moreover, one of the men "intentionally" bumped petitioner as they were being escorted out of the club. *Id.* at 62. Finally, petitioner witnessed one of the men punch Wright in the head just before petitioner started shooting.

I find that none of these events singly or in combination are likely to have convinced a jury that they could have reasonably provoked petitioner to respond as he did. *See People v. Maher,* 89 N.Y.2d 456, 463, 654 N.Y.S.2d 1004, 677 N.E.2d 728 (1997). In *People v. Roldan,* 222 A.D.2d 132, 647 N.Y.S.2d 179 (1st Dep't 1996), the court found that the EED defense was proven by a preponderance of the evidence where the defendant, a security guard, was in a state of fear when he found his partner lying in a pool of blood and surrounded by three men. Defendant believed the three men had just killed his partner. In contrast, here, petitioner was not faced with such extreme circumstances. First, petitioner alleges that after he witnessed some of the victims verbally harassing his wife and one of them bumped into him, he did not say or do anything in response. Hearing Tr. at 61–62. Although petitioner claims that he later saw Wright get punched in the head, petitioner did not see anyone severely beaten. He had no reason to fear for his safety since he was the only person in the club who was armed. Under the circumstances, the 440 court reasonably found on the record before it that the jury would not have accepted petitioner's conduct as "an understandable human response deserving of mercy." *Roche,* 98 N.Y.2d at 78, 745 N.Y.S.2d 775, 772 N.E.2d 1133.

Moreover, petitioner's and his wife's testimony at the hearing regarding his depression and its effects were not persuasive in providing a factual basis for the EED defense. For example, their testimony concerning petitioner's alleged suicide attempt was not believable. Petitioner testified that his half-hearted suicide attempt occurred on the night before the shooting, while his wife testified that the incident occurred about one week before the shooting. Hearing Tr. at 10–11, 70–71. Despite the loud sound of the gunshot in the apartment, both testified that the police did not respond to their apartment nor did any neighbors inquire about the noise. *Id.* at 20–21, 83. Further, petitioner's wife testified that although she was concerned about her husband potentially hurting himself, she never told anyone about the suicide attempt, including the police or petitioner's family. *Id.* at 22–23. Petitioner similarly testified that he never told anyone about the incident until he spoke to his present counsel regarding the circumstances surrounding the night of the shooting at the Orealla. *Id.* at 81.

Petitioner further testified that at the time of the shooting he was under enormous financial pressure because the Orealla had accumulated a variety of debts. At the hearing, petitioner submitted documentary exhibits purportedly showing the Orealla's poor financial condition. However, the documents submitted merely show that the Orealla had been behind in paying some of its bills. The exhibits alone do not demonstrate the net financial condition of the Orealla, nor petitioner individually. Moreover, because three of the bills are dated after the shooting occurred, those invoices obviously did not impact petitioner's psyche. *See* Hearing Exhs. 2–e, f, g.

Petitioner's wife's only testimony on the subject was vague and unconvincing. Mrs. Shiwlochan testified that "business was not what it used to be. We had—well, I had gotten quite a few phone calls from bill collectors. Bills were late, things like that." Hearing Tr. at 9–10. Although petitioner testified that he did not tell any-

one in his family of the pressure he was feeling, *id.* at 83, on cross-examination, he admitted that he was not the sole person responsible for paying the family's outstanding bills. *Id.* at 97. In any event, more persuasive evidence of financial problems is not likely to establish that petitioner was under an extreme emotional disturbance. *See People v. Torres*, 144 A.D.2d 709, 534 N.Y.S.2d 703 (2d Dep't 1988) (jury could have reasonably determined that landlord threatening to evict defendant and her small children was not reasonable explanation or excuse).

Petitioner's testimony regarding prior violent incidents at the Orealla is not clearly substantiated by other evidence. Hearing Tr. at 48–51. Although petitioner offered his investigator's report showing that on October 27, 1991, a few months before the shooting, an arrest was made for gun possession near the Orealla, *see* Hearing Exh. 3, even that evidence does not confirm petitioner's claim that someone wielded a gun on the dance floor at the Orealla. Hearing Tr. at 50–51. Moreover, petitioner's testimony that two Orealla patrons were shot outside the club in 1988 is contradicted by his trial testimony that the shooting in December, 1991 was the first time there had ever been gunfire at or near the club.[10] Tr. at 904. In any event, that incident is of marginal relevance given the lapse in time and the fact petitioner did not even witness the shooting. Hearing Tr. at 48–49. Similarly, petitioner's testimony that Wright was once threatened in front of the Orealla, absent any evidence as to petitioner's involvement in the incident, is unavailing. *Id.* at 50.

Petitioner's testimony that he was distraught because the night of the shooting marked the second anniversary of his ex-girlfriend's gruesome murder is not corroborated by any evidence other than an investigator's affidavit confirming the date of Christine Persaud's death. Hearing Exh. 5 at ¶ 6. Indeed, petitioner's wife was neither aware that the date had any particular significance in petitioner's life nor that petitioner had a prior relationship with Persuad. Hearing Tr. at 12.

In sum, the evidence adduced at the hearing fails to establish that petitioner was under such stress as to explain any emotional disturbance.

As to the subjective element of the EED defense, something akin to a "loss of self-control" is required. *Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d 775, 772 N.E.2d 1133. Acting out of anger or embarrassment is insufficient. *People v. Walker*, 64 N.Y.2d 741, 743, 485 N.Y.S.2d 978, 979, 475 N.E.2d 445 (1984) (trial court not obligated to charge EED defense where evidence showed "defendant acted out of anger or embarrassment or both"); *People v. Matthews*, 220 A.D.2d 822, 632 N.Y.S.2d 298 (3d Dep't 1995) (defendant may have been distraught or angry at the prospect that the victim had infected him with a sexually transmitted disease, but his conduct did not constitute the characteristic loss of complete control associated with the defense). Likewise, evidence that the defendant and the victim argued before the murder is insufficient to establish the defense. *People v. Deresky*, 137 A.D.2d 704, 525 N.Y.S.2d 49 (2d Dep't 1988). For example, in *People v. Berk*, the court rejected the EED defense finding that defendant's actions, including chasing the victim into the kitchen and calling her a "son of a bitch" as he shot at her, were "deliberate and rational and the result of his male-

---

10. At trial, petitioner acknowledged that there was a shooting up the block from the club but did not identify the victims as Orealla patrons nor suggest that the incident started at the Orealla. Tr. at 904.

volence" rather than a loss of control. 217 A.D.2d at 943, 629 N.Y.S.2d 588.

Petitioner's actions just prior to the shooting are not indicative of a loss of self-control. Even after petitioner witnessed the victims harassing his wife and one of them purposely bumped into him, he did nothing in response. Hearing Tr. at 103–04. Rather, he was routinely clearing glasses from the bar when he heard a commotion at the entrance and grabbed his gun. *Id.* at 63. Further, petitioner testified, at the hearing, that he purposely fired the first shot out the door and over the patrons' heads. *See id.* These actions were conscious and deliberate, rather than indicative of any of the signs normally associated with an extreme emotional disturbance.

Even during the shooting, petitioner did not exhibit a loss of self-control. The testimony adduced at trial established that petitioner deliberately placed his gun near Mahelal's forehead when he fired. *Id.* at 56. Petitioner also held the gun against Jaggernauth's neck and fired while Jaggernauth's hands were in the air. *Id.* at 57, 60. Petitioner's actions belie the notion that he "acted with the characteristic loss of complete control associated with this defense." *People v. Matthews,* 632 N.Y.S.2d at 300; *see Walker,* 64 N.Y.2d at 743, 485 N.Y.S.2d 978, 475 N.E.2d 445.

The defendant's reaction after a homicide is also relevant to evaluating a defendant's mental state. For example, leaving the scene of the crime and taking other steps to avoid apprehension have been found to be inconsistent with the loss of control associated with an EED defense. *People v. Dominguez,* 226 A.D.2d 391, 640 N.Y.S.2d 583 (2d Dep't 1996) (EED not applicable where defendant left scene after shooting, consciously decided not to return home, disposed of the weapon and fled the state to avoid apprehension); *see People v.*

*Feris,* 144 A.D.2d 691, 535 N.Y.S.2d 17 (2d Dep't 1988) (defendant's normal appearance during the conversation with two witnesses immediately prior to the incident and his ability to skillfully drive in an effort to leave the scene was inconsistent with a loss of self-control). Here, petitioner's conduct after the shooting is inconsistent with him suffering from a mental infirmity at the time of the shooting. Immediately after the shooting, petitioner fled to his apartment where he hid the murder weapon under the kitchen sink to avoid detection. Hearing Tr. at 109–111. Then, he climbed into the drop ceiling and hid there until he was found and arrested by the police. *Id.* at 110. Petitioner's efforts to hide the gun and evade detection by the police are products of a conscious decision and undermine the claim that he was acting under the influence of an extreme emotional disturbance. *See Roche,* 98 N.Y.2d at 77, 745 N.Y.S.2d 775, 772 N.E.2d 1133.

In sum, I find no prejudice resulted from trial counsel's failure to investigate the EED defense.

Likewise, for the same reasons, petitioner cannot establish prejudice resulting from his counsel's failure to object to the trial judge's omission of the EED instruction. In any event, the Appellate Division specifically found that the EED defense was not established by a preponderance of the evidence at trial and rejected petitioner's claim that the trial court's failure to give the instruction on the statutory EED defense denied him a fair trial. *See Shiwlochan,* 676 N.Y.S.2d at 475. "It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws or treaties of the United States." *Ponnapula v. Spitzer,* 297 F.3d 172, 182 (2d Cir.2002); *see also Estelle v. McGuire,* 502 U.S. 62, 67–68, 112

S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Thus, this Court is bound by the decision of the Appellate Division rejecting the applicability of the New York statutory affirmative defense of extreme emotional disturbance. *Parron v. Quick*, 869 F.2d 87, 90 (2d Cir.1989) (finding no prejudice on claim of ineffective assistance of counsel where Appellate Division ruled that underlying speedy trial claim had no merit). Further, given that the facts presented by petitioner at the hearing did not significantly augment the facts contained in the affidavits reviewed by the 440 court, this Court also recommends deferring to the 440 court's findings as to the EED defense. Accordingly, since there was no basis for arguing that petitioner suffered from an extreme emotional disturbance, trial counsel was not ineffective for failing to raise this defense and for failing to object when the trial court omitted the defense in its charge.

## IV. *Ineffective Assistance of Appellate Counsel*

Petitioner argues that he was denied effective assistance because appellate counsel failed to raise the issue of trial counsel's ineffectiveness based on his failure to object to the trial court's omission of the EED instruction. Instead of framing the appeal in terms of ineffective assistance of trial counsel, appellate counsel characterized the issue as judicial error.

In order to prevail on a claim of ineffective assistance of appellate counsel, a petitioner must demonstrate that his attorney's representation (1) "fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466

U.S. at 688, 104 S.Ct. 2052; *Mayo*, 13 F.3d at 533 ("Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel"); *Claudio*, 982 F.2d at 803; *Abdurrahman*, 897 F.2d at 74. In satisfying "the prejudice prong of *Strickland*," a petitioner claiming that appellate counsel was ineffective must show "a reasonable probability that the unraised claim would have been successful before the state's highest court." *Marsh v. Ricks*, No. 02 Civ. 3449, 2003 WL 145564, at *5 (S.D.N.Y. Jan.17, 2003); *Peterson v. Bennett*, No. 01–CV–920, 2002 WL 1592600, at *4 (E.D.N.Y. July 18, 2002); *see Claudio*, 982 F.2d at 803.

 Because there was no basis for arguing that petitioner suffered from an extreme emotional disturbance, appellate counsel was not ineffective for failing to raise ineffective assistance of trial counsel for failing to pursue that defense. In denying petitioner's *coram nobis* motion which raised this claim, the Appellate Division found that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel." 276 A.D.2d 651, 714 N.Y.S.2d 911. That court's determination is not contrary to, and does not involve an unreasonable application of, clearly established federal law, for the reasons discussed above. *See Aparicio v. Artuz*, 269 F.3d 78, 94–95 (2d Cir.2001) (appellate counsel not ineffective for failing to raise meritless claim).

## CONCLUSION

For the foregoing reasons, I recommend that this Court grant Nit Shiwlochan's petition for a writ of habeas corpus on the ground that he received ineffective assistance of trial counsel in connection with a plea offer and that petitioner's sentence be reduced to 15 years. I further recommend

that petitioner's remaining claims be denied.

A copy of this Report and Recommendation is being transmitted via Federal Express to the parties on this date. Any objections must be filed with the Clerk of the Court, with a copy to the undersigned, by January 20, 2004. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

SO ORDERED.

December 31, 2003.